SYSTEM FEDERATION NO. 40, RAILWAY
EMPLOYEES DEPARTMENT OF THE
AMERICAN FEDERATION OF LABOR, et
al. v. VIRGINIAN RY. CO.

No. 329.

District Court, E. D. Virginia, Norfolk
Division.

July 24, 1935.

Frank L. Mulholland, of Toledo, Ohio, and S. M. Brandt, of Norfolk, Va., for complainants.

Williams, Loyall & Taylor and Walter C. Plunkett, all of Norfolk, Va., John C. Donnally, of Washington, D. C., and H. T. Hall, of Roanoke, Va., for defendant.

WAY, District Judge.

This is a suit by System Federation No. 40, Railway Employees Department of the American Federation of Labor, and others, against the Virginian Railway Company, seeking to enforce certain rights and praying for certain relief under the Railway Labor Act, as amended June 21, 1934 (US CA title 45, § 151 et seq.). For convenience complainants will be referred to herein as the Federation, the defendant as the Railway, the Mechanical Department Association of the Virginian Railway as the Association, the Independent Shop Crafts Association of the Virginian Railway as the Independent, and the National Mediation Board as the Board.

The beginning of the controversy between the Railway and its shop craft employees, which has resulted in this litigation, dates back prior to July 1, 1922, and unfortunately a decision of the case involves the necessity, it seems to the court, of stating the material facts covering the dispute which has thus extended over a period of twelve years or more.

### The Strike of July 1, 1922.

Prior to July 1, 1922, the employees of the Railway were affiliated with the American Federation of Labor. On that date, following the refusal of the Federation to accept certain reductions in pay under an order of the National Railroad Labor Board, which Board was organized pursuant to the provisions of the National Transportation Act of 1920 (41 Stat. 456), the members of the Federation in the Mechanical Department of the Railway went on strike. As a result of the strike when interference with the operation of trains in interstate commerce became acute, the Railway applied for and was granted injunctions by the District Courts of the Western District of Virginia and Southern District of West Virginia, prohibiting the Federation, its officers, agents, and members, from interfering with the employees of the Railway in the performance of their duties, or with the operation by the Railway of its trains in interstate commerce.

### Organization of the Mechanical Department Association of the Virginian Railway Company.

On July 3, 1922, the United States Railroad Labor Board adopted a resolution calling upon the employees of carriers generally to organize themselves into associations for the purpose of collective bargaining with respect to matters pertaining to rates of pay, rules, and working conditions. On October 1, 1922, the Mechanical Department employees of the Railway formed the Mechanical Department Association of the Virginian Railway (which Association is hereinafter referred to as the Association) and adopted a written constitution and by-laws. Thereafter, the Association through its general chairman and representatives of the different crafts of said Association entered into a contract with the Railway, dated November 15, 1922, to become effective as of November 15, 1922, and to remain in force one year, and thereafter until changed by the authorized representatives of the respective parties. The Association was kept alive by the election every two years of local committeemen and a chairman for each craft. The chairmen of the six crafts constituted the system committee, which in turn elected a general chairman. The Association continued thus to function from the date of its organization to October 3, 1933, the date the committees of the different crafts, the chairman of each, and the general chairman were elected. As already noted, a form of contract between the Association and the Railway was entered into covering matters pertaining to rates of pay, rules, and working conditions. This contract provided for the establishment of a system board of adjustment consisting of an equal number of representatives on behalf of the Railway and the Association, which board of adjustment was to be final authority for the settlement

of grievances and disputes arising with respect to said subject matter of the contract. The relations of the members of the Association so far as it functioned and the Railway seem to, have been amicable up to 1927. At that time the Federation became active in its efforts to establish an organization among defendant's employees.

With respect to the formation and activities of this Association, the testimony reveals that no employee knew just how or when he became a member thereof, that no dues were ever assessed or paid by members, that meetings were held only once every two years and then apparently for the sole purpose of electing officers and committeemen, that the notices of the elections were sent out from an office of the Railway, that all expense incident to the organization and maintenance of the Association was defrayed by the Railway, and that no substantial grievances were ever taken up by the Association representative with the Railway.

Facts Leading up and Incident to the Dispute in Question which Resulted in the Invocation of the Services of the National Mediation Board.

As already stated, the Federation became active through its agents and organizers in 1927, and this activity finally culminated in the formation of a local organization. The activities of such organization may be summarized as follows: (1) A letter was sent by B. M. Jewell, president of System Federation No. 40, dated March 7, 1934, to the Railway stating that he had been authorized to represent the different shop craft employees of the Railway, and requesting that the letter be accepted as authority for him to represent the crafts. This authorization was not accepted or recognized by the Railway. Prior to April 13, 1934, the Federation invoked the services of the Board of Mediation as constituted under the Railway Labor Act of May 20, 1926 (see 45 USCA § 151 et seq.); and the Railway was notified by letter, dated April 17, 1934, that the services of the Board had been invoked. The Railway advised the Board by letter dated April 24, 1934, that the Federation did not represent the employees involved, that no dispute existed, and that the services of the Board were not required. However, on June 4, 1934, after having taken jurisdiction of the matter, the Board sent a mediator to Norfolk for the purpose of settling the dispute. The Railway accept-

ed the Board's offer of mediation, and the Board sent H. H. Reed, another mediator, to Norfolk on July 5, 1934, to determine whether or not a majority of Railway's mechanical department employees had authorized the Federation to represent them. At that time a conference was held by Mediator Reed with one Duffey representing the Federation and representatives of the Railway, which resulted in arrangements being made for checking authorizations held by the Federation against the Railway's pay rolls for the first half of April, 1934, and also in an agreement that these authorizations should embrace the classes of employees set forth in letter dated March 7, 1934. This check was commenced on July 6, 1934, but before completion Duffey, representing the Federation, notified Mediator Reed that he desired to withdraw the firemen and oilers, roundhouse and shop laborers from the list included in the letter and the request for mediation made to the Board, to which withdrawal protest was made by defendant, but the Board permitted these employees to be withdrawn. Further check under this revised arrangement was concluded on July 16, 1934, with the result that the Federation held authorizations from 408 employees out of a total of 845 excluding firemen and oilers, shop and roundhouse laborers, and 1,058 if the latter were included. The Board took no further action on that check. On August 10, 1934, the Railway received a telegram from the Board, created pursuant to the Railway Labor Act as amended, advising that it had accepted a request from the Federation to investigate and certify representatives of the mechanical department employees of the Railway, against which action the Railway protested. Pursuant to this notification, R. B. Bronson, mediator, was sent to Norfolk on August 13, 1934, to investigate. On August 14, 1934, a conference between Mediator Bronson, C. L. Bentley, representing the Federation, J. W. Sasser, superintendent of motive power, and L. A. Markham, assistant to the president of the Railway, was held and resulted in the selection of J. W. Munsey, general chairman of the Association, as representative of the Association by the Board. This selection of Munsey apparently was over the protest of Mediator Bronson, because at that time Munsey was identified with and active in the Federation. C. L. Bentley insisted upon the selection of Munsey. At this conference a written agreement was

prepared by Mediator Bronson and entered into by the above representatives, setting forth the rules and regulations governing the election to be held on August 16, 1934.

Statement to the Members of Mechanical Department Association of the Virginian Railway Company on Employee Representation, Issued by J. W. Sasser, Superintendent of Motive Power and Dated July 11, 1934, with the Approval of the Railway.

This statement, after setting forth the purposes of the Railway Labor Act of 1926, said:

"Statements have been made in the press and elsewhere, in many instances with a purpose, that the Amendment to the Railway Labor Act has abolished Company Employee Unions. There is nothing in the Amendment to the Act which prohibits Company Unions, nor the right of such Unions to designate representatives of their choice for the purpose of conferring with representatives of the carrier.

"Let it be understood at the outset that the Management of The Virginian Railway Company is in no sense opposed to the principle of collective bargaining, and has practiced it for years. It not only accepts the principle and entirely approves of it, but does not believe that any dispute can be settled with the same degree of success or of satisfaction where one side of the controversy has no interest in the property and has no familiarity with the problems involved, which only an employee can have.

"Recent persistent efforts of the American Federation of Labor seeking authorization from members of the Mechanical Department Association of The Virginian Railway Company to represent the members in future conferences with representatives of The Virginian Railway Company, makes it necessary for the Management to present to its employees who will be affected a plain statement of facts in connection with the proposed change. Before the members of that Association shall act each member owes it to himself that he should give due consideration to some of the facts involved in the proposed change from Company Employee Representation to National Organization Representation. When such consideration has been given, the employees and members of that Association are entirely free to exercise their choice of representatives, free from fear or favor from their employer.

"Since its organization in 1922 the Mechanical Department Association of The Virginian Railway Company has, in pursuance of its agreement which has stood the test of years, worked out without friction all questions that have arisen between them. The relations between the Company and the members of the Association are harmonious and the arrangement has proved satisfactory. The mutual acquaintance of representatives of the employees and of the Management, the knowledge of the property and the interest of the men in it creates a condition which is most desirable. None can fail to appreciate the seriousness of changing a condition which has proved so satisfactory in the past.

"It will hardly be denied by any of its members that the chief object of the American Federation of Labor is eventually to bring about the closed shop in industry, thereby regimenting labor and reducing the individual to a mere cipher with little or no influence in the management of his local Association.

"On July 1, 1922, practically all of the Mechanical Department employees of The Virginian Railway Company affiliated with System Federation No. 40, Railway Employees Department, American Federation of Labor, went on strike. This action resulted from a strike order issued by the executives of the organizations comprising the Federated Shop Crafts. This course, as is well known, proved disastrous to the organizations and unfortunate to the men composing them.

"On July 3, 1922, the U. S. Railroad Labor Board issued a circular suggesting that the employees remaining in the service and the new employees succeeding those who left the service take steps as soon as practicable to form such an Association or Organization as might be deemed necessary to function in the representation of the employees before the Board. In line therewith, on October 1st, 1922, the shop employees of The Virginian Railway Company organized the Mechanical Department Association, with which all past negotiations pertaining to rates of pay, rules and working conditions, have been conducted. For the past year an attempt has been made to discredit in every manner this Association (commonly called Company Union) by professional representatives of organized labor in an effort to have its members authorize the Railway Employees Department, American

Federation of Labor, to represent them in negotiations with the Railway Company rather than the Mechanical Department Association, which has represented them successfully for the past twelve years. And it has come to the attention of the Management that as an inducement for representation by American Federation of Labor promises of increased rates of pay and other matters have been made that cannot be fulfilled. Prior to the strike of 1922 there was continued dissension that frequently resulted in strikes without a single benefit, but did result in great loss of wages to the employees. For twelve years perfect harmony has prevailed. There have been no strikes and disputes have been promptly adjusted with satisfaction. It will be recalled that the Management in its negotiations with the representatives of the organization has time and again stated that it would be fair and impartial in its dealings with its members and would provide as good working conditions and as high rates of pay as was given by any other railroad, and it is known that this promise has been carried out, and that the same policy will be continued.

"In the depression period from July, 1932, to July, 1933, at the Huntington, West Virginia, shops on the Chesapeake and Ohio Railway the men averaged 9.1 days per month with a greatly reduced force, while on The Virginian Railway at the Princeton shops the men averaged 12 days per month with practically a full force, or in other words the Virginian men worked 31.8% more than the men on the Chesapeake and Ohio.

"If the employees of the Company desire to affiliate with the National Organization they are free to do so. Such a course will, it is believed, and the past has so shown, result in differences and controversies between the Company and non-employee representatives, which would be avoided if there is a mutuality of interest and a relationship that has in it something of a personal nature. The Mechanical Department Association is founded on the basis of harmony, and it is the desire of the Management that this harmonious relationship shall continue.

"The above statement is made so that each member of the Mechanical Association and those employees who are not members may give careful consideration to all matters entering into the question of representation by employees of the Compa-

ny on the one hand or on the other hand by representation by members of the American Federation of Labor."

"The Management therefore hope that each man for himself will, before acting, give careful thought to the subject of representation."

This statement was signed by Mr. Sasser, and its circulation to employees of the Railway arranged by him. Sufficient copies were sent to various points on the Railway and turned over to officers of the Association, to be distributed to all employees in the various departments of the Railway which include the crafts here involved. The circulation occurred shortly after July 11, 1934, the date of the circular, and at a time when a mediator was on the Railway's premises endeavoring to adjust the controversy with reference to representation. As one reason for issuing and distributing this statement, the answer of the Railway charges that its employees were being coerced by representatives of the Federation, at the time, but no proof of such alleged coercion of any of the employees was submitted, nor was any investigation ever made with respect to the alleged complaints before the issuance of the above statement by Mr. Sasser.

### The Election.

As before stated, a conference was held by Mediator Bronson with the representative of the Federation and the superintendent of motive power and the assistant to the president representing the Railway, which resulted in the selection of J. W. Munsey, general chairman of the Association, as the representative of that organization in the election to be held. A written agreement was entered into by these representatives setting forth the rules and regulations for an election by secret ballots to be held at Princeton, W. Va., and other points on the road, on August 16, 1934. This agreement provided that the representatives of the six shop crafts should be determined by *a majority of the total votes shown on the eligible list of votes for the respective crafts.* It does not seem necessary to go into detail as to this election. After the first day at Princeton, Bentley, representing the Federation, protested the election to the mediator in charge on the ground that the Railway was influencing the men not to vote. The mediator declined to interfere and Bentley protested to the Board in Washington also, in consequence of which protest a new election

was ordered to be held at Princeton on August 20, 1934, and at other points on the road on subsequent days. It was further ordered that the new election should be held under a rule providing that *a majority of the legal votes cast* by the six separate shop crafts should determine the representatives of the respective crafts. The change in this rule was protested on the alleged grounds that the rule was at variance with the one agreed upon for the election of August 16, 1934, and was also contrary to the provision of section 2-fourth. of the amended Railway Labor Act (USCA title 45, § 152), which provides: *"The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this Act* [chapter]."

Based on the election the National Mediation Board issued its certificate under date of September 13, 1934, certifying System Federation No. 40 as the representatives of *all six crafts* of the Railway's mechanical department employees. This certificate will hereafter be more fully discussed. A majority of all the eligible voters in each of the six crafts involved, save one, voted; in four of the crafts, namely, the machinists, sheet metal workers, electrical workers, and boilermakers, a majority of all the eligible voters favored the Federation; in the case of the blacksmiths, a majority of all eligible to vote, voted, but the Federation received only a majority of the votes actually cast; while in the case of the carmen and coach cleaners less than a majority of all eligible, voted, but the Federation received a majority of the votes actually cast by that craft. See footnote 1.[1]

Bulletins in accordance with the provisions of the agreement were posted prior to the election under supervision of the Railway through J. W. Sasser, superintendent of motive power, who was present at the different points on the road during the election but not present at the polls while the employees were actually voting. Private booths, voting places, ballot boxes, ballots, and the necessary equipment were all arranged by him at each voting place to assist the mediator in conducting the election, and the mediator was assisted by said Munsey and Bentley as silent observers.

Munsey was a member of both the Association and the Federation, but that fact was generally known by the members of the six crafts as well as by the Railway through Mr. Sasser. The latter was aware of Munsey's affiliation with the Federation as long as nine or ten months prior to the election, and also prior to the time he (Sasser) notified Munsey that he had been selected as observer to represent the Association in taking the vote. The election was fairly and honestly conducted, after due notice to all entitled to participate therein. All employees eligible to vote who desired to do so had full opportunity to vote.

The testimony of two witnesses, Nelson, called by complainants, and Nevins, by the Railway, with respect to a certain conversation had between the two immediately before the election, is conflicting but important. The appearance and demeanor of the two witnesses on the stand and a study of their testimony has led the court to give credit to Nelson's testimony with respect to what was said by Nevins in the conversation referred to. Nelson had been working for the Railway ten or twelve years at Victoria, Va., for the most part as "carman helper" at helpers' rate of pay. Nevins, the other witness referred to, was then and is still employed by the Railway as master mechanic at Victoria.

Nelson testified, in substance, that Nevins, the master mechanic, came to Nelson's home the evening prior to the election and that the question was brought up about the election to be held the next day; that Nevins told him that if the road went into the American Federation of Labor, Victoria would be nothing more than a cornfield, that the Railway had been talking about cutting out Victoria for a long time, and it was on account of the loyal men at Victoria that the shops remained there; that Nelson would not be working for the company thirty days if it went into the Federation; and that he (Nevins) felt just like telling the men those things if he had to go to Atlanta Prison, or anything like that, for telling them. Nelson testified that

---

1 The vote was as follows:

| | Eligible | For Federation | For Association |
| --- | --- | --- | --- |
| Sheet metal workers | 52 | 37 | 9 |
| Carmen and coach cleaners | 266 | 98 | 20 |
| Machinists | 267 | 141 | 41 |
| Blacksmiths | 46 | 22 | 8 |
| Electrical workers | 114 | 80 | 11 |
| Boilermakers | 79 | 51 | 9 |
| Totals | 824 | 429 | 98 |

on account of this conversation he did not vote for the Federation in the election. There was also substantial testimony with respect to the conduct of the general car foreman in the Railway Shops at Elmore, W. Va., some time subsequent to the election, which conduct in the light of all the circumstances also indicates a purpose on the part of the general car foreman to influence the men in the shops to affiliate with the Independent (the Company Union) rather than with the Federation.

### Organization and Activities of the Independent Shop Crafts Association.

This organization appeared shortly after the certification by the Board (September 13, 1934) of the results of the election. In some respects the Independent functioned to a greater extent than did its predecessor, the Association. The members signed applications for membership, paid dues, formulated and adopted a constitution (December, 1934), held meetings, and elected officers. It also appears that in the autumn of 1934 and the early part of this year the Federation representatives named pursuant to the election were endeavoring to make appointments for conferences with the executives of the Railway, but that the latter either failed to grant such requests for appointments or, where appointments were made, simply disregarded and failed to keep them. The failure of the Railway in some instances to make, and in others to keep, appointments to confer with the Federation representatives is mentioned at this time because it throws light upon the purpose of the organization of the Independent and the determination by the Railway not to recognize the Federation representatives although it never, prior to the institution of this suit, unequivocally and openly asserted that the election was not valid.

The apparent organizer of the Independent was H. C. Hearne, an employee in the car department. Hearne was chairman of the carmen for the Roanoke division in the Association at the time he organized the Independent. He also 'protested the election on the ground, among others, that Munsey, the silent observer designated to represent the Association, was also a member of Federation No. 40. Later when carrying the protest to the Board in Washington, Hearne was accompanied or joined there by counsel for the Railway. Hearne, after organizing the Independent, became its general chairman, although at that time his term of office in the Association had not yet expired. These facts are referred to because of their bearing upon the question whether or not the Association and the Independent ever had any real existence separate and apart from the Railway's control. The indications from his action and testimony are strongly to the effect that Hearne in organizing the Independent was not in good faith representing the crafts, but was in fact acting at the behest of the Railway. And upon the whole case the evidence indicates unmistakably that the real contestants in the election were the Federation and the Railway, that such is the situation in the controversy involved in this litigation, and that the parts played by the Association and the Independent in those contests have been very largely that of mere figureheads.

### Certification of the National Mediation Board Issued September 13, 1934, Certifying that Federation No. 40 was the Duly Authorized Representative of Employees·Herein Involved.

The services of the Board were invoked on August 10, 1934, and the certification was made on September 13, 1934, four days after the expiration of the thirty-day period prescribed by the statute, which provides that "it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier." (45 USCA § 152, par. 9.)

This provision of the statute would appear to be directory rather than mandatory, so that the election is not rendered void merely because the certification was made after the expiration of the thirty days. While such failure might subject the Board to criticism, it is hardly sufficient to invalidate an election otherwise valid. That part of the act prescribes a duty rather than a limitation upon the powers of the Board.

It is also contended by the Railway that the election is void because one of the rules under which it was held was in violation of the act which provides (§ 2, par. 4), among other things, that the *"majority of any craft or class"* of employees shall have the right to determine who shall be

the representative of the craft or class," etc. It seems to me that this defense also is without merit. A reasonable interpretation of the act is that the election must be open to each craft or class with full untrammeled opportunity to each eligible employee in such craft to vote, although he may not be compelled to exercise that right. The statute is similar, it would appear, to statutes or by-laws providing that a majority of the stockholders of a corporation shall constitute a quorum at a stockholders' meeting. Where such quorum is actually present at a duly called meeting, a majority of those may transact all business of the corporation that may properly come before the stockholders unless the statute or by-laws expressly require a greater number of affirmative votes than a mere majority of the quorum. In this case, in every instance except one, more than a majority of those eligible to vote actually participated in the election; that is, exercised the right to determine who should represent that craft or class in negotiating with the Railway in respect to certain matters. That, it seems to me, meets all the requirements of majority rule in the five crafts where a majority of all eligible actually voted, although in one of those instances less than a majority of all eligible voted for the Federation. But in the craft (carmen and coach cleaners) where less than a majority of those eligible to vote, actually voted, it would seem to follow that there was no election by that craft, and as to that craft the certificate of the Board is without force or effect.

As above stated, J. W. Munsey, who was chosen as the representative of the Association in the election held in August, 1934, was also affiliated with and active in organizing the Federation among the employees of the Railway, so that at the time he acted as silent observer for the Association, he was a member of both the Association and Federation. If his membership in the Federation had been kept secret, or if there were any substantial evidence tending to show that the election was unfair or tainted in any way with fraud or with misconduct on his part, the court would be disposed to treat this dual membership as being of far greater importance than it does treat it under the circumstances disclosed. But there is a complete lack of any evidence or intimation that the election was unfair, dishonest, or improperly conducted in any respect or that Munsey was guilty of any misconduct. On the contrary, all the testimony on that subject shows that the election was fairly and honestly conducted and that every one entitled to vote had full opportunity to exercise that right without hindrance or interference by the Federation or any one connected with it. Furthermore, the affiliation of Munsey with the Federation was generally known to both the Railway and the members of the crafts involved, long before the election. For instance, it appears from the testimony that as early as November, 1933, Munsey applied to Mr. Sasser for leave to post notices on the Railway bulletin boards for the purpose of calling the men together looking to the formation of an organization affiliated with the Federation.

The only point made against Munsey is that he consented to the change made in the rule with respect to the majority required. While the rule as changed was in conflict with the act in that the act requires *a majority of a craft or class* to determine who shall represent it and the rule as changed merely required a majority of those voting to make such determination, the results are the same as they would have been had the rule not been changed. In other words, that particular phase of the election was covered by an express provision of the act itself and any attempt to change it was simply without effect. To the extent that the election complied with the requirements of the act it should be upheld, but disregarded where it did not meet those requirements; that is to say, a majority of all eligible in each of five of the crafts actually voted, and as applied to those crafts the election was valid and binding, but in the case of the carmen and car cleaners less than a majority of the eligibles voted, so that as to that craft there was no election.

### Nature of the Work Performed in the Railway Shops at Princeton, West Virginia.

A large percentage of the Railway employees in the six crafts referred to work in the back shops at Princeton, W. Va. It is contended by the Railway that the operations in those shops are purely intrastate, and that the relation of such work to the interstate transportation carried on by the Railway is too remote for interruption or cessation of such shop work even for long periods to directly affect interstate commerce. The testimony with respect to the work in the Princeton shops may be summarized as follows:

The Roanoke division of the Railway has been electrified in recent years as a result of which there has been a change in the operation of trains. Prior to electrification Princeton was a terminal and trains were operated by steam from Princeton to Roanoke, Va., and to Elmore, W. Va., that is, Princeton was a division point and running repairs were made there; but since electrification running repairs are made at Elmore and Mullens, W. Va., and Roanoke, Va. At Princeton 322 men are employed doing classified repairs, one only of which number is engaged in making running repairs. In addition to the 322 employees referred to, but not included in that number, are 20 men employed in the car department engaged in making running repairs. The classified repairs (back shop work) done by the 321 employees is heavy repairs on locomotives and cars, such as rebuilding and putting them in shape for months of service. To make such repairs it is necessary to withdraw the cars and engines from service, and this work usually requires an average time of about 105 days for locomotives and 109 days for cars. In addition to classified repairs, a great deal of store work is performed in these shops. Store work consists of manufacturing material which is placed in the stores to be issued out at different points along the railway. Practically all the repair parts for outlying points on the railway are thus made in the Railway shops, because they can usually be manufactured there more cheaply than the Railway can buy them, but where the Railway can procure such parts more cheaply in the market it purchases them.

Princeton is not a terminal point, but on the average 1,200 to 1,400 foreign cars (cars owned by other railroads) per month are either cleared or pass through Princeton over the Railway's lines. If such cars are so badly damaged as to require heavy repairs, the work is done at Princeton, and any emergency repairs are made there if the need is discovered, but cars are not inspected at Princeton. The repair work at Princeton is for the use of the Railway to take care of the equipment used in carrying the 97 per cent. of interstate commerce. In brief, the work done there by these crafts is similar to that done in railway machine shops generally.

During the trial it was admitted that approximately 97 per cent. of all the transportation performed by the Railway is interstate. While this estimate is approximate only, the true figure, if ascertained, would probably vary only slightly from the estimate, since it is a matter of common knowledge that the business of the Railway consists very largely in transporting coal from the mines in West Virginia to the Railway's deep-water terminal at Norfolk, Va.

That the operations conducted in the shops at Princeton are purely intrastate is not, it seems to me, seriously debatable, and if the matter was controlled by that fact alone I should not hesitate to hold that the Board was without any authority or jurisdiction over the relations between the 321 employees performing back shop repairs and the Railway. However, the decision of the question as to whether or not the Railway Labor Act as amended in 1934 can validly be applied to the relationship between these employees and the Railway depends upon the character of the relation of the shops and the work performed there to the Railway considered as a whole and as an instrumentality of interstate commerce. That this Railway is more completely such instrumentality than almost any other railway of its size in the country is apparent.

It will also be seen from the evidence that when these shops are in operation at approximately their full capacity, there is, so to speak, a stream of engines and cars passing through them, out of and back into interstate transportation activity. And while it is true that engines and cars repaired or rebuilt there are frequently out of service for comparatively long periods (the average being 105 and 109 days, respectively), I have no serious doubt that if the operations in the shop were suspended by a labor dispute for any considerable length of time the interstate transportation service of the Railway would be seriously hampered or interrupted, and if the suspension in the shops continued very long that such interruption would very seriously cripple its interstate transportation operations. The effort of the Railway to show that these shops are not necessary to the conduct of its transportation activities was not impressive. While the operation of the shops by the Railway is not absolutely necessary, for the reason that the Railway could probably have the work, in large part at least, done by independent contractors, it has nevertheless chosen to do the work in its own shops, which is the only practical method of keeping such important operations under its immediate control. In that

way it avoids the chances of being embarrassed by delays and other troubles beyond its control and the consequent danger of interruption of its transportation business. Furthermore, the idea of separating the employees of a common carrier whose business is so overwhelmingly interstate in its nature, into two classes, one subject and the other not subject to the provisions of the act of Congress, when their work is so closely and intimately related, does not make a strong appeal to the court. The sounder and better view would seem to be to regard the Railway, with all of its activities, as a single instrumentality of interstate commerce. When it is thus viewed, it seems clear that serious interruption or suspension of the work in the shops would very probably directly and immediately adversely affect interstate commerce. In A. L. A. Schechter Poultry Corporation v. United States, 55 S. Ct. 837, at page 849, 79 L. Ed. 1570, 97 A. L. R. 947, it is said: "The power of Congress extends, not only to the regulation of transactions which are part of interstate commerce, but to the protection of that commerce from injury. It matters not that the injury may be due to the conduct of those engaged in intrastate operations. Thus, Congress may protect the safety of those employed in interstate transportation, 'no matter what may be the source of the dangers which threaten it.' Southern Railway Company v. United States, 222 U. S. 20, 27, 32 S. Ct. 2, 4, 56 L. Ed. 72. We said in Mondou v. New York, N. H. & H. R. Co. (Second Employers' Liability Cases), 223 U. S. 1, 51, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44, that it is the 'effect upon interstate commerce,' not 'the source of the injury,' which is 'the criterion of congressional power.' We have held that, in dealing with common carriers engaged in both interstate and intrastate commerce, the dominant authority of Congress necessarily embraces the right to control their intrastate operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to secure the freedom of that traffic from interference or unjust discrimination and to promote the efficiency of the interstate service."

And the following reasoning from the opinion in Southern Ry. Co. v. United States, 222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72, seems appropriate at this point:

"For these reasons it must be held that the original act, as enlarged by the amend-atory one, is intended to embrace all locomotives, cars, and similar vehicles used on any railroad which is a highway of interstate commerce.

"We come, then, to the question whether these acts are within the power of Congress under the commerce clause of the Constitution, considering that they are not confined to vehicles used in moving interstate traffic, but embrace vehicles used in moving intrastate traffic. The answer to this question depends upon another, which is, Is there a real or substantial relation or connection between what is required by these acts in respect of vehicles used in moving intrastate traffic, and the object which the acts obviously are designed to attain; namely, the safety of interstate commerce and of those who are employed in its movement? Or, stating it in another way, Is there such a close or direct relation or connection between the two classes of traffic, when moving over the same railroad, as to make it certain that the safety of the interstate traffic and of those who are employed in its movement will be promoted in a real or substantial sense by applying the requirements of these acts to vehicles used in moving the traffic which is intrastate as well as to those used in moving that which is interstate? If the answer to this question, as doubly stated, be in the affirmative, then the principal question must be answered in the same way. And this is so, not because Congress possesses any power to regulate intrastate commerce as such, but because its power to regulate interstate commerce is plenary, and competently may be exerted to secure the safety of the persons and property transported therein and of those who are employed in such transportation, no matter what may be the source of the dangers which threaten it. That is to say, it is no objection to such an exertion of this power that the dangers intended to be avoided arise, in whole or in part, out of matters connected with intrastate commerce."

Again, Congress in the exercise of its paramount power may prevent the common instrumentalities of interstate commerce from being used in their intrastate operations to the injury of interstate commerce, and thus may require the level of intrastate rates to be brought to the level of the interstate rates on the same commodities in order to prevent discrimination against interstate traffic. Houston, etc., Ry. Co. v. United States, 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; State of Alabama v. Unit-

ed States, 279 U. S. 229, 49 S. Ct. 266, 73 L. Ed. 675.

The basic theory of these decisions is the regulatory power over a carrier and its rate structure as a unitary implement of commerce "when the adequate maintenance of interstate commerce involves and makes necessary on this account the incidental and partial control of intrastate commerce, the power of Congress to exercise such control has been clearly established." Dayton-Goose Creek Railway Co. Case, 263 U. S. 456, 44 S. Ct. 169, 174, 68 L. Ed. 388, 33 A. L. R. 472.

Broadly considered, therefore, it would be difficult for the courts to conclude either as a matter of fact or of law that the segregation of a group of employees of a railroad from the remaining mass and their employment in work upon units of rolling stock withdrawn, after all, only for a time from use in interstate commerce, could remove that group of employees from the operation of the Railway Labor Act on the theory that their relationships with the company in the matter of bargaining concerning wages, hours, and conditions of work, is unrelated to the general problem of the labor relationships of the railroad to the whole body of its employees.

■■■ As the Supreme Court has frequently pointed out, if legislation upon any subject is within the power of Congress, it is not the province of the courts to set limits to the exercise of the power. Unless there is no substantial basis for the exercise of legislative judgment in respect of a subject-matter generally within its power, its action will not be held to be arbitrary. Radice v. New York, 264 U. S. 292, 294, 44 S. Ct. 325, 68 L. Ed. 690.

If, therefore, the act properly construed is broad enough in its provisions to include within its liberal and remedial purposes the relationships of the railroad with this particular group of employees, there can be little, if any, question of the power of Congress to do so. If I have correctly interpreted the contentions of the Railway, it admits that the act of Congress is that broad and for that reason contends it is unconstitutional. Be that as it may, it seems clear that the provisions of the act are sufficiently broad and inclusive to warrant the interpretation that it was intended to apply to this and similar cases. With the exception of the question above discussed, all of the constitutional questions presented by the Railway's pleadings have been re-solved adversely to it by the Supreme Court in Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U. S. 548, 50 S. Ct. 427, 74 L. Ed. 1034. In Railroad Retirement Board v. Alton R. Co., 55 S. Ct. 758, at page 771, 79 L. Ed. 1468, it was said: "The railway labor act was upheld by this court upon the express ground that to facilitate the amicable settlement of disputes which threatened the service of the necessary agencies of interstate transportation tended to prevent interruptions of service and was therefore within the delegated power of regulation. *It was pointed out that the act did not interfere with the normal right of the carrier to select its employees or discharge them.* Texas & New Orleans R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U. S. 548, 570, 571, 50 S. Ct. 427, 74 L. Ed. 1034." (Italics supplied.)

## Are Complainants Entitled to Injunctive Relief?

■■■ In conclusion it is earnestly contended by the Railway that no case has been made out by complainants to justify the court in granting any injunction, mandatory or otherwise, against it. And it is also said that the only affirmative relief which the court, upon any proper view of the case as presented, could grant would be one requiring the Railway to recognize and treat with the complainant, System Federation No. 40, and, in substance, that since the Railway and complainants cannot be required to make or enter into any contract or understanding with respect to hours of work, rates of pay, or conditions of work, that to order the Railway "to recognize and treat with" complainants would be to issue a vague, useless, and impractical order contrary to the established practice of courts of equity.

It is further urged that the failure of Congress to attach any penalty to the refusal of a carrier to confer or recognize and treat with employee representatives is highly significant. This latter contention refers particularly to section 2, paragraphs second, sixth, and ninth of the amended Railway Labor Act (USCA title 45, § 152). And examination of the act as amended does disclose that the penalties prescribed in the tenth paragraph of section 2 (45 US CA § 152, par. 10) are to be inflicted for "willful failure or refusal," "to comply with the terms of the third, fourth, fifth, seventh, or eighth paragraph of section 2 [this section]." The acts and omissions

against which the complainants seek relief in the instant case are violative of the provisions of the ninth paragraph of section 2. It is clear, therefore, that violation of the provisions of the ninth paragraph does not subject the Railway or its officials to any penalty prescribed by the act. Notwithstanding that fact, the contention apparently presents no new or novel question for decision. In Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, supra, 281 U. S. 548, at page 569, 50 S. Ct. 427, 433, 74 L. Ed. 1034, the Chief Justice, in disposing of a similar contention, said:

"In reaching a conclusion as to the intent of Congress, the importance of the prohibition in its relation to the plan devised by the act must have appropriate consideration. *Freedom of choice in the selection of representatives on each side of the dispute is the essential foundation of the statutory scheme.* All the proceedings looking to amicable adjustments and to agreements for arbitration of disputes, the entire policy of the act, must depend for success on the uncoerced action of each party through its own representatives to the end that agreements satisfactory to both may be reached and the peace essential to the uninterrupted service of the instrumentalities of interstate commerce may be maintained. There is no impairment of the voluntary character of arrangements for the adjustment of disputes in the imposition of a legal obligation not to interfere with the free choice of those who are to make such adjustments. On the contrary, it is of the essence of a voluntary scheme, if it is to accomplish its purpose, that this liberty should be safeguarded. The definite prohibition which Congress inserted in the act can not therefore be overridden in the view that Congress intended it to be ignored. As the prohibition was appropriate to the aim of Congress, and is capable of enforcement, the conclusion must be that enforcement was contemplated.

"*The absence of penalty is not controlling.* The creation of a legal right by language suitable to that end does not require for its effectiveness the imposition of statutory penalties. Many rights are enforced for which no statutory penalties are provided. In the case of the statute in question, there is an absence of penalty, in the sense of specially prescribed punishment, with respect to the arbitral awards and the prohibition of change in conditions pending the investigation and report of an emergency board, but in each instance a legal obligation is created and the statutory requirements are susceptible of enforcement by proceedings appropriate to each. *The same is true of the prohibition of interference or coercion in connection with the choice of representatives. The right is created and the remedy exists.* Marbury v. Madison, 1 Cranch, 137, 162, 163, 2 L. Ed. 60." (Italics supplied.)

It is also urged that the evidence fails to present any case which would justify the court in granting injunctive relief in the face of the provisions of the Act of March 23, 1932 (29 USCA § 101 et seq.), limiting the jurisdiction of United States courts to grant injunctions in labor disputes. That act defines a "labor dispute" as follows: "The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." (29 USCA § 113 (c).

And section 107 of that act prohibits any United States court from issuing an injunction in any case "involving or growing out of a labor dispute," until after a hearing such as was had in this case and "except after findings of fact by the court, to the effect—

"(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act excepting against the person or persons, association, or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof;

"(b) That substantial and irreparable injury to complainant's property will follow;

"(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

"(d) That complainant has no adequate remedy at law; and

"(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection."

It must be assumed, I think, from the facts found that this is a case involving or arising out of a labor dispute, and consequently governed in the matter of issuing an injunction by the provisions of said Act of March 23, 1932.

Does the evidence present a case which meets the requirements of that act? It seems to me that this question must be answered in the affirmative. The Railway, acting through its officers and agents, has persistently interfered with the shop craft employees in their efforts to organize for the purpose of collective bargaining, one of the principal objects if not the dominant object of the Railway Labor Act. This unlawful interference and purpose to influence its employees has been evidenced chiefly through activities of the Railway in creating and promoting so-called independent organizations, both before and since the election and by its fixed determination not to recognize or treat with the chosen representatives of the crafts unless they come from an organization under its control. In addition, I hardly think that any one can read with an open mind the Sasser statement referred to and quoted at length above without fairly concluding that it was printed and circulated to "use the authority and power" of the Railway "to induce action" by the members of the craft "in derogation of what the statute calls 'self organization.'" That it probably and naturally had the intended effect on many of those to whom it was delivered is no more than a reasonable inference to be drawn from the situation and power of the author over those to whom it was addressed. It is likewise clear that similar acts will be continued in the future to defeat or seriously interfere with self-organization and representation unless prohibited. The right of self-organization and representation in the matter of rates of pay, hours of labor, and working conditions is a property right, the loss of which would result in irreparable damage to complainants. Texas & N. O. R. Co. v. Brotherhood of Ry. & S. S. Clerks, supra. Complainants have no adequate remedy at law to enforce that right, greater injury will undoubtedly be inflicted upon them by denial than upon defendant by the granting of relief, and the controversy is not a matter with which local public officials can deal. It involves rights granted by an act of Congress and local public officials are without authority or power to protect or enforce such rights. Myers v. Louisiana & A. Ry. Co. (D. C.) 7 F. Supp. 92, 97.

It follows from what has been said that the complainants are entitled to an injunction, in substance, restraining the Railway, its officials, agents, and representatives, from in any way interfering with the complainants and the members of the crafts involved in the matter of self-organization, and requiring the Railway to recognize and treat with the complainant System Federation No. 40 as the representative of the five crafts in matters pertaining to rates of pay, hours of employment, and working conditions. It is also the conclusion of the court that the injunctive relief should be broad enough to prohibit the Railway in the future from fostering, encouraging, or promoting the activities of the Mechanical Department Association of the Virginian Railway and the Independent Shop Crafts Association of the Virginian Railway or any similar organization, and requiring it as between System Federation No. 40 and other organizations, if any, to be and remain neutral and to permit all of said crafts and the members thereof to exercise the right of self-organization and representation without interference, influence, or coercion by the Railway, its officials or representatives.

An order in accordance with the views herein expressed will be entered when presented.