# Presidential Authority to Extend Deadline for Submission of an Emergency Board Report Under the Railway Labor Act

The President may require an Emergency Board under the Railway Labor Act to submit its report before the statutory deadline, but he may not extend that thirty-day deadline unless the parties involved have entered into a side agreement extending the status quo period during which they refrain from self-help.

There is substantial doubt as to whether a court would conclude that such a side agreement between the parties not to resort to self-help is equitably enforceable under the Norris-LaGuardia Act.

The President does not have the authority to impose a second status quo period by convening a second Emergency Board or reconvening the original Board.

March 13, 1990

MEMORANDUM OPINION FOR
THE ASSOCIATE COUNSEL TO THE PRESIDENT

This memorandum responds to your request for our views as to the extent of the President's power to alter the length of the thirty-day time period within which an Emergency Board appointed under section 10 of the Railway Labor Act ("RLA"), 45 U.S.C. § 160, must submit its report to the President. As explained more fully below, we conclude that, because the filing of the report has specific legal consequences, the President does not have the authority to unilaterally extend the statutory deadline. He may, however, shorten the time for filing a report. We also conclude that the President may grant an extension in situations where the parties involved have agreed to extend the period during which they will refrain from self-help. Given the lack of case authority, however, it is difficult to determine whether a court would equitably enforce such an agreement. In our view, there is no more than an even chance that a court would conclude that such agreements are equitably enforceable despite the Norris-LaGuardia Act, and there remains a substantial litigation risk that a court would reach a contrary conclusion. Finally, we conclude that the President does not have the authority

57

to impose a new status quo period creating a second Emergency Board.

## I. Background

We understand that under National Mediation Board ("NMB") auspices, the National Railway Labor Conference and seven of the affected railway labor organizations (collectively "the parties")[1] have agreed to an extended two-phase Emergency Board procedure for addressing all of the unresolved issues in the current round of national bargaining. Under the contemplated procedure, the National Mediation Board would proffer arbitration to the parties on all of the outstanding issues, and the parties would decline the proffer, thus triggering a thirty-day "cooling-off" period. *See* 45 U.S.C. § 155 First.

The NMB would then promptly recommend that the President appoint an Emergency Board under section 10 of the RLA, 45 U.S.C.§ 160. Although the Emergency Board would be established to address all issues involved in the collective bargaining dispute, it would produce two separate reports, with the first addressing the health and welfare issues and the final report addressing the wages and rules issues. As soon as the health and welfare report was issued, the NMB would, at the request of the parties, engage in further intensive emergency mediation on the wages and rules issues. In order to allow the Emergency Board sufficient time to prepare its reports, the parties have agreed to an extension of the deadline for submission of the Emergency Board's final report to the President. Specifically, the parties have requested that all reports and recommendations of the Emergency Board be issued by September 15, 1990, and the parties have agreed to any reasonable request for an extension of time of the Emergency Board to allow ample time for hearings, mediation and formulation of recommendations. The parties have also agreed not to resort to self-help until after the expiration of the thirty-day RLA statutory 'cooling-off' period following the report by the Emergency Board on the Wage and Rules issues, and then only if Congress is in session.

We understand that this proposal is only one of several under consideration. Accordingly, this memorandum discusses general principles concerning the limits on altering the RLA procedures, rather than analyzing the particulars of any specific proposal.

## II. Discussion

Section 10 of the Railway Labor Act provides that, once created, an Emer-

---

[1] We are informed by the NMB that there are other labor organizations that have yet to agree to this procedure.

gency Board "shall investigate promptly the facts as to the dispute and make a report thereon to the President within thirty days from the date of its creation." 45 U.S.C. § 160. Section 10 further provides that "[a]fter the creation of such board and for thirty days after such board has made its report to the President, no change, except by agreement, shall be made by the parties to the controversy in the conditions out of which the dispute arose." *Id.* Thus, on its face the statute appears to contemplate a status quo period of no more than sixty days after creation of an Emergency Board.

## A. *President's power to alter deadline for submitting report*

### 1. *President may not unilaterally extend deadline*

We believe that the President may not unilaterally extend the deadline for submission of the Emergency Board report. First, the language of the statute does not provide for any extension in the thirty-day time period within which the Emergency Board must submit its report. Moreover, the legislative history indicates a fairly clear intent not to permit extensions of the reporting deadline and the subsequent start of the thirty-day cooling-off period. Indeed, Congress, in enacting the RLA, specifically rejected an amendment that would have authorized unilateral presidential extensions of the reporting deadline.

In the House hearings on the bill, Congressman Burtness questioned representatives of both labor and management about the adequacy of the thirty-day time period. Mr. Richberg, the counsel for the organized railway employees, stated that thirty days would be adequate, that the Emergency Board provision had been the subject of very difficult negotiation, and that because of the status quo provision, the parties did not want an Emergency Board that would "operate indefinitely after a controversy has gone to this stage." *Railroad Labor Disputes: Hearings on H.R. 7180 Before the House Comm. on Interstate and Foreign Commerce*, 69th Cong., 1st Sess. 100 (1926) ("*House Hearings*").[2] Mr. Thom, the General Counsel of the Association of Railway Executives, testified to the same effect, explaining that the thirty-day period was the result of a compromise between labor and management, that this was a significant concession, and that the parties involved did not want "anything but a prompt method of dealing with the situation in the case of an emergency board." *Id.* at 128.

Apparently not satisfied with these responses, Congressman Burtness offered an amendment on the floor of the House that would have provided that "the President may in his discretion extend such time in which the report is

---

[2] The Supreme Court has repeatedly noted that, because the RLA was frankly acknowledged to be "an agreement worked out between management and labor, and ratified by the Congress and the President," the "statements of the spokesmen for the two parties made in the hearings on the proposed Act are entitled to great weight in the construction of the Act." *Chicago & N.W. Ry. v. United Transp. Union*, 402 U S 570, 576 (1971).

to be made an additional period of not to exceed thirty days." Staff of Subcomm. on Labor, Senate Comm. on Labor and Pub. Welfare, 93d Cong., 2d Sess., *Legislative History of the Railway Labor Act, As Amended* 453 (Comm. Print 1974) (reprinting congressional debates). Congressman Burtness argued that thirty days would often not be sufficient time and that there would be no danger in allowing the President to have this discretion to extend the deadlines. *Id.* The amendment was rejected with little debate. *Id.*

We recognize that it might be argued that an extension is permissible because the thirty-day period is meant merely to be directory rather than mandatory. *Cf. United States v. Air Florida, Inc.*, 534 F. Supp. 17, 20 (S.D. Fla. 1982) (thirty-day time period in which NMB, under section 2 Ninth of the RLA, must certify conclusions of representational dispute, was "directory rather than mandatory;" accordingly, failure of NMB to meet deadline did not invalidate its investigation and subpoena request); *see also System Fed'n No. 40, Ry. Employees Dep't v. Virginian Ry.*, 11 F. Supp. 621, 627 (E.D. Va. 1935), *aff'd*, 84 F.2d 641 (4th Cir. 1936), *aff'd*, 300 U.S. 515 (1937). In light of the legislative history of the provision, however, it would be difficult to conclude that the thirty-day statutory deadline was merely meant to be directory, rather than mandatory. Indeed, were the deadline read to be merely directory, the President could unilaterally extend the reporting date, thus effectively extending the status quo period. An Emergency Board would be able to achieve the same result simply by delaying the submission of its report. Either of these conclusions would directly contradict the intent of the RLA drafters as expressed in the legislative history.

Our conclusion is not altered by the general rule of construction that a "statutory time period is not mandatory unless it *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision." *Thomas v. Barry*, 729 F.2d 1469, 1470 n.5 (D.C. Cir. 1984) (quoting *Fort Worth Nat'l Corp. v. FSLIC*, 469 F.2d 47, 58 (5th Cir. 1972)); *see also St. Regis Mohawk Tribe v. Brock*, 769 F.2d 37, 41 (2d Cir. 1985) (collecting cases), *cert. denied*, 476 U.S. 1140 (1986); *Usery v. Whitin Machine Works, Inc.*, 554 F.2d 498, 501 (1st Cir. 1977). The statutory time table at issue defines a narrow exception to the parties' rights to use self-help. General rules of construction cannot be used to defeat these specific restrictions and create a unilateral, discretionary ability to derogate from these rights. Furthermore, we question whether this general rule of construction could be applied to contradict "clear indications of congressional intent that the limitations are to be strictly enforced." *Usery*, 554 F.2d at 501.

In any event courts would likely hold that application of this rule indicates that the deadline in section 10 is mandatory. Section 10 expressly requires the Emergency Board to submit its report "within thirty days from the date of its creation." 45 U.S.C. § 160. Moreover, although on its face the RLA does not specify the consequences of the late filing of an Emergency Board report, it seems clear from the above discussion of the legislative

history that the RLA effectively penalizes late reports by failing to toll the start of the statutory cooling-off period, thus refusing to extend the status quo period beyond sixty days.

Finally, as discussed more fully below, we believe that courts would likely give significant weight to any construction of the Act that was supported by long-established administrative practice. In this regard, we are not aware of any instance in the sixty-four years of practice under the RLA where the President unilaterally extended the time for report over the objection of the parties.[3] The information supplied to us by the NMB indicates that extensions have generally been made only upon the request of the parties, who generally made a separate side agreement extending the status quo.

Accordingly, we conclude that the thirty-day deadline for the submission of the report is mandatory, and that it may not be extended by the President or by an Emergency Board.

### 2. President's power to shorten deadline

An Emergency Board is appointed by the President and is within the executive branch. Nothing in the language of the statute even purports to limit the President's constitutional authority to supervise the board. Indeed, the legislative history of the Act appears to contemplate that the board would function at the direction and control of the President.[4] Accordingly, we believe that the President may alter the deadline within which an Emergency Board must submit its report, so long as the new deadline is within the statutory thirty-day time period. The President may therefore require the board to submit its report in *less* than thirty days.

### B. Extension of report deadline with the consent of the parties

We note that research by the NMB staff indicates that at least fifty Emergency Boards created since 1960 have submitted their reports more than thirty days after their creation. With apparently few exceptions[5], these extensions were the result of requests by the parties or the board that an extension be granted by the President, accompanied by an agreement by the parties to abide by an extended status quo period (usually until thirty days

---

[3] The NMB has informed us that Emergency Board No. 209 submitted its report four days late without obtaining the consent of the parties. We are not aware, however, whether the Emergency Board obtained a formal presidential extension, or simply submitted its report just a few days late.

[4] In this regard, we note that the legislative history places considerable emphasis on the fact that an Emergency Board is a *presidential* board. *See, e.g.,* Staff of Subcomm. on Labor, Senate Comm. on Labor and Pub. Welfare, 93d Cong., 2d Sess., *Legislative History of the Railway Labor Act, As Amended* 294 (Comm. Print 1974) (reprinting congressional debates) (statement of Rep. Newton) (stating that parties would cooperate with an Emergency Board because "[n]either party would defy the President of the United States"); *id.* at 229 (statement of Rep. Cooper) (Emergency Board is backed by "the power and prestige of the President").

[5] The NMB has indicated that Emergency Board No 209 submitted its report four days late without any agreement by the parties to abide by an extension. *See* note 3 *supra.*

after the late report is submitted). The Department of Labor has informed us that the total number of such extensions since the enactment of the RLA is more than seventy. The Labor Department also reports that, up to the present time, no party has ever reneged on a side agreement to forbear from self-help. Of course, as noted below, this perfect track record means that the legally binding character of these extensions has never been subject to litigation.

### 1. *Legality of an extension granted with parties' consent*

We believe that, despite our earlier conclusions concerning unilateral extensions, several arguments can be made that an extension granted with the consent of the parties would not violate section 10 of the RLA. First, and most importantly, the granting of extensions when the parties have agreed to extend the status quo period is supported by a long and consistent administrative practice under the Act. This practice would presumably be entitled to considerable weight in the construction of the statute. *See, e.g., Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984) (noting that the Court has "long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer"); *see also North Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) ("Where 'an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'") (quoting *United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979)).[6] Indeed, this office, in an earlier opinion approving the use of extensions with the consent of the parties, placed considerable weight on this past practice, noting that "this is a point upon which 'a page of history is worth a volume of logic.'" Memorandum for Laurence H. Silberman, Deputy Attorney General, from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: President's Power to Extent [sic] in which Emergency Board Under Railway Labor Act Must Submit its Report* at 2 (June 19, 1974) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)).

Second, we note that the existence of an enforceable[7] side-agreement between the parties extending the status quo period would have the effect of removing all consequences of late submission of the report. By binding the parties to refrain from the use of self-help until after a specified period, the side agreement renders the running of the statutory clock irrelevant. There

---

[6] Given the frequency of the practice, and Congress' occasional statutory intervention into the resolution of particular disputes, it cannot seriously be doubted that Congress has been fully aware of the use of extensions. We are not aware of any congressional attempts to limit such practices.

[7] We discuss the issue of enforceability below. *See infra* pp. 63-66.

would thus be no consequences to a failure to meet the section 10 deadline, and, in these circumstances, it might fairly be said that the import of the thirty-day deadline was merely "directory" rather than "mandatory." *See Thomas*, 729 F.2d at 1470 n.5 (statutory time period is not mandatory unless it expressly requires action within a particular time period *and* specifies consequences for a failure to comply). In short, when failure to comply with the deadline is completely without practical effect, there is no reason why the deadline may not, in those circumstances, be treated as directory.

Finally, we note that nothing in the legislative history is inconsistent with these conclusions. The legislative history discussed above indicates that the drafters were concerned with the delays that might be caused by *unilateral* presidential or board action. *See supra* pp. *59-60; see also House Hearings* at 100 (statement of Mr. Richberg) (stating that indefinite extensions for an Emergency Board's report were undesirable because "there is always a great interest on the part of one person to have delay and on the part of the other person not to have delay.") By contrast, where the parties have themselves agreed to extend the status quo period, the drafters' concerns are fully satisfied. Indeed, permitting an extension in such circumstances would be consistent with the RLA's declared purposes of avoiding interruptions to commerce and of providing for the "prompt and orderly settlement" of disputes between carriers and employees. 45 U.S.C. § 151a. Of course, given the President's power to insist upon the report within the statutory time frame, *see supra* p. 61, the President may refuse to grant an extension despite the parties' agreement to refrain from self-help and despite their request that he permit the extension.

2. *Enforceability of an agreement to refrain from self-help during extended Emergency Board proceedings*

We believe that the issue of whether any side agreement by the parties would be equitably enforceable under the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115 is a difficult one, give the lack of judicial authority on this question.[8] We believe that there is no more than an even chance that a court would enforce such an agreement given the consistent past practice, over a long period of time, of using these agreements to facilitate the RLA dispute settlement processes. Nevertheless, a significant argument can be made that these agreements are, strictly speaking, outside the process mandated by the RLA, and there is thus a substantial litigation risk that they would be declared to be equitably unenforceable.

Among other things, section 4 of the Norris-LaGuardia Act, 29 U.S.C. § 104, provides:

No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in

---

[8] In this regard, we note that the Labor Department has advised us that the enforceability of such side agreements has never been subject to litigation.

any case involving or growing out of any labor dispute to pro-
hibit any person or persons participating or interested in such
dispute . . . from . . . [c]easing or refusing to perform any
work or to remain in any relation of employment . . . .

The Supreme Court has held that, despite the broad reach of this language,
the Norris-LaGuardia Act "does not deprive the federal court[s] of jurisdic-
tion to enjoin compliance with various mandates of the Railway Labor Act."
*Burlington N.R.R. v. Brotherhood of Maintenance of Way Employees*, 481
U.S. 429, 445 (1987) (quoting *International Ass'n of Machinists v. Street*,
367 U.S. 740, 772-73 (1961)). The Court emphasized, however, that "[t]his
exception is necessarily a limited one," and that, even when a party seeking
injunctive relief is able to show a violation of a duty imposed by the RLA,
"[c]ourts should hesitate to fix upon the injunctive remedy . . . unless that
remedy alone can effectively guard the plaintiff's right." *Id.* at 446 (quoting
*International Ass'n of Machinists*, 367 U.S. at 773).

The key issue is whether a breach of the side agreement would violate
any of the "various mandates of the Railway Labor Act." We believe that a
persuasive argument can be made that any breach of the side agreement
would violate section 2 First of the RLA, 45 U.S.C. § 152 First, which
provides:

It shall be the duty of all carriers, their officers, agents, and
employees to exert every reasonable effort to make and main-
tain agreements concerning rates of pay, rules, and working
conditions, and to settle all disputes, whether arising out of
the application of such agreements or otherwise, in order to
avoid any interruption to commerce . . . .

In *Chicago & N.W. Ry. v. United Transp. Union*, 402 U.S. 570 (1971), the
Supreme Court held that, notwithstanding the provisions of the Norris-
LaGuardia Act, a federal court has jurisdiction in appropriate circumstances
to enjoin a strike, even during the self-help period, where the union has
failed to satisfy its section 2 First obligation to use every reasonable effort
to settle the dispute.
    The precise scope of this duty, and of the exception to the anti-injunction
provisions of the Norris-LaGuardia Act that it creates, is difficult to discern.
In *Trans Int'l Airlines, Inc. v. International Bhd. of Teamsters*, 650 F.2d 949,
962 (9th Cir. 1980), *cert. denied*, 449 U.S. 1110 (1981), the court held, per
Judge (now Justice) Kennedy, that a breach of a contractual promise not to
strike during the self-help period was an enjoinable violation of the section
2 First duty only if there is a substantial relationship between the breach and

the RLA dispute resolution procedures: "Absent a substantial nexus with statutory dispute settlement mechanisms or an agreement to arbitrate, an injunction may not issue to prevent a plain breach of a no-strike clause by a union." Applying this standard, the court concluded that the contract at issue, which flatly prohibited strikes against certain flights, was not equitably enforceable. The contract regulated *conduct during the self-help period*, when the parties had fully exhausted the RLA dispute resolution procedures, and therefore the "RLA plan for avoiding disruption [was] not threatened by the . . . strike." *Id.* at 963. *Chicago & N.W. Ry.* was distinguished on the grounds that, in that case, "the union had failed to use reasonable efforts to comply with the mandatory disputes settlement mechanisms that lie at the heart of the Act," and that the injunction in that case therefore protected the "integrity" of the RLA processes. *Trans Int'l Airlines*, 650 F.2d at 963.

We believe that the best argument for enforcing such side agreements is that they have a "substantial nexus with [the] statutory dispute settlement mechanism[]." *Id.* at 962. Given the long-established practice of entering into side agreements to facilitate the production of the statutorily required reports by the Emergency Board, we believe that these agreements are arguably part of the dispute resolution process. At a minimum, it would appear that they indeed have a "substantial nexus" to that process.[9]

There is, however, a potential counterargument. As our earlier discussion shows, these side agreements regulate conduct that is, strictly speaking, outside the statutory status quo period. Accordingly, their "nexus" to the statutory scheme might be questioned, especially if a court were to read *Trans Int'l Airlines* as broadly prohibiting any injunctions once the strict statutory deadlines had passed.

It might also be argued in support of enforcing the agreement that a strike called before the expiration of the extended period specified in the side agreement is a violation of the status quo provisions of section 10.[10] We believe, however, that this argument is untenable in light of our earlier conclusion that late submission of the report will not toll the running of the *statutory* status quo period. Indeed, the possibility of an extension being granted at all hinges upon the parties' willingness, by private contract, to

---

[9] Indeed, it might also be argued that the union's conduct in agreeing to an extension of the status quo period, with its consequent effects in altering the normal RLA process, is a breach of the section 2 First duty where, as is likely to be the case, the union intended all along to abide only by the strict statutory definition of the status quo period. Such a case would closely resemble *Chicago & N.W. Ry.*, which authorized an appropriate injunction, *during the self-help period*, where the union failed to use reasonable efforts to settle the dispute during the RLA dispute settlement procedures. Indeed, a union's actions in causing the delay of the submission of the report, with the intent to take full advantage of the strict statutory deadline, would arguably "threaten" the "RLA plan for avoiding disruption," and an appropriate injunction against the ensuing strike would "protect" the "integrity of these mechanisms." *Trans Int'l Airlines*, 650 F.2d at 963. The availability of this argument, however, would appear to turn on the union's intent at the time of entering into the side agreement.

[10] It is clear that a federal court has jurisdiction to enforce compliance with the status quo provisions of section 10. *See, e.g., Pan American World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n*, 306 F.2d 840, 846 (2d Cir. 1962).

65

extend the status quo period beyond that specified in the statute.[11] Accordingly, we conclude that, although a union might violate the side agreement by calling a strike outside the sixty-day statutory period, it does not thereby violate section 10.[12]

Lastly, it might be argued that, to the extent that there is any ambiguity in the side agreement concerning the extent of the restrictions on self-help, the necessary interpretation of the agreement raises a "minor" dispute that must be resolved under the compulsory arbitration provisions of the RLA, *see* 45 U.S.C. § 153. The Supreme Court has held that, pending the resolution of these minor dispute resolution procedures, the parties have an equitably enforceable obligation to refrain from self-help. *See Brotherhood of R.R. Trainmen v. Chicago River & I.R.R.*, 353 U.S. 30 (1957). This argument may be unavailing for two reasons. First, if *Trans Int'l Airlines* is correct in holding that agreements to regulate conduct during the self-help period are not equitably enforceable, it is unclear how there can be any need for arbitration to determine to what *extent* the side agreement limits self-help; the agreement will be equitably unenforceable regardless of the extent of its restrictions.[13] Second, the availability of this argument hinges on the precise wording of the restrictions in the side agreement drafted by the parties, a factor that is not within the control of the executive branch. If the restrictions are clearly worded, no minor dispute can arise, and no equitable relief will be available under this theory.

## C. Presidential power to reconvene emergency boards

We do not believe that the President possesses power to impose a second status quo period by convening a second Emergency Board or by reconvening the original board. Neither the text nor the legislative history of the RLA provide any support for such a power. Indeed, the legislative history's emphasis on the need for a prompt resolution of the board's activities, within a fixed period of time, affirmatively undercuts the notion that the President may extend the status quo period simply by reconvening or reappointing the board.

Nor do we believe that past practice under the Act provides any support for such a power. The NMB has informed us that there appears to have been

---

[11] Moreover, because the possibility of an extension depends upon the parties' private contract, there is arguably no reason why the parties may not agree to extend the status quo period until ten or twenty (rather than thirty) days after the Emergency Board's late submission of the report. It would be difficult to argue that such an "extension plus ten days" period is equivalent, for purposes of the RLA and the Norris-LaGuardia Act, to the statutory period described in section 10.

[12] We reach this conclusion despite the fact that the statute states that the cooling-off period comprises the "thirty days after such board has made its report to the President." As discussed above, the wording of this section was based on the drafters' assumption that the thirty-day deadline would be strictly complied with.

[13] It might be argued, however, that interpretation of the agreement would still be necessary in order to determine the extent of entitlement to other forms of relief, such as damages.

only two such reconventions in the last forty-one years.[14] The information that we have been given concerning such reconvention indicates the fairly narrow circumstances under which boards have been reconvened. Thus, both of the two boards that were reconvened between 1950 and 1987 were reconvened only after the parties had requested this action and only for the purpose of clarifying an ambiguous point in the board's original report. *See* Letter from H. Witt, Member, NMB to the President (Sept. 8, 1986) (reconvening of Emergency Board No. 211); Letter from Emergency Board No. 187 to the President (Nov. 26, 1975) (report of reconvened board). These very limited precedents provide no support for the view that the President may impose a new status quo period by reconvening an Emergency Board over the objections of the parties or to deal with completely different issues.[15]

## CONCLUSION

We conclude that the President may grant an extension for filing a report by an Emergency Board appointed under section 10 of the Railway Labor Act only if the parties consent to the extension by making a side agreement that extends the status quo period. As a practical matter, the effectiveness of any such extension of the status quo period depends upon the equitable enforceability of the side agreement, a matter concerning which there is substantial doubt. Furthermore, although the President may not unilaterally extend the thirty day deadline for filing a report, he may shorten it. Finally, any subsequent boards appointed by the President (whether by reconvening an Emergency Board or appointing a new one) cannot bind the parties to status quo without their consent.

JOHN O. McGINNIS
*Deputy Assistant Attorney General*
*Office of Legal Counsel*

---

[14] The NMB has stated that there may have been as many as four reconventions in the first twenty-four years, but it does not as yet have information on the circumstances of the reconventions.

[15] Of course, the President may choose to consult with the members of the former board about any issue relating to the dispute, but this would not be an action taken under the RLA, and it would not have the effect of imposing a new status quo period.