## NATIONAL LABOR RELATIONS BOARD v. WHITTIER MILLS CO. et al.

### No. 9423.

Circuit Court of Appeals, Fifth Circuit.

May 2, 1940.

Rehearing Denied June 11, 1940.

Charles Fahy, General Counsel, National Labor Relations Board, Robert B. Watts, Associate General Counsel, National Labor Relations Board, and Gerhard Van Arkel, Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

John Wesley Weekes and Chas. Murphey Candler, Jr., both of Decatur, Ga., for respondents.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

On a consolidated hearing Whittier Mills Company, Silver Lake Company, and Scottdale Mills, all more or less under the same management and represented in the transactions under scrutiny by the same bargaining agents, were ordered by the National Labor Relations Board to desist from refusing to bargain with Textile Workers Organizing Committee as the exclusive representative of the production and maintenance employees of the mills, and from interfering with or coercing the employees; and required them to bargain, and to post notices in the usual form. The Board applies to the court for a decree enforcing the order, but it alleges no disobedience of it since it was made. No answer was filed, but resistance is made by brief on three grounds: (1) That the Committee was not the lawful bargaining agency of the employees at the material dates; (2) that the one act found of cutting wages pending the negotiation without notifying and discussing it with the Committee was not a refusal to bargain; (3) that neither such act of wage cutting, nor the proven remarks of two foremen constituted interference with or coercion of the employees by the mills.

■ Our Rules 38 and 39 do not expressly require the filing of an answer in cases of this kind, but an answer is desirable to show that there is opposition and the grounds thereof. No point having been made touching its absence, we will not order one, but will treat the filed brief as its equivalent.

■ A case of disobedience ought generally to be alleged in a petition for enforcement, for an order that is obeyed needs no aid. But because compliance is not asserted by the respondents, but the validity of the order is controverted, we will assume disobedience.

1. As to the first point of attack, the record shows that on November 1, 1937, the Board, after due proceedings under Section 9 of the National Labor Relations Act, 29 U.S.C.A. § 159, and on secret ballots of the employees, certified the Textile Workers' Organizing Committee as the bargaining representative of the employees of the respondents; and that in each election a majority of the employees voted, and a slender majority of those voting voted for the Committee; but those voting for the Committee in no instance were a majority of the employees in the bargaining unit designated by the Board. The unfair labor practices found by the Board occurred in June and July, 1939, after the number of employees in each bargaining unit had decreased materially because of curtailment of operations. The contentions are that since the record concerning the certificates shows on its face that the Committee is not a "Representative designated or selected for the purpose of collective bargaining by the majority of the employees in a unit appropriate for such purposes," (Section 9 (a) of the Act), the certificates are invalid because contrary to law; and since the memberships of the units have substantially changed in the year and a half since the certificates were made, if originally valid they no longer show the Committee to be the true representative of the employees.

■ The decisions in American Federation of Labor v. National Labor Board, 60 S.Ct. 300, 84 L.Ed. ——, and National Labor Relations Board v. International Brotherhood of Electrical Workers, 60 S. Ct. 306, 84 L.Ed. ——, denied jurisdiction in the Circuit Courts of Appeal to review such certificates before an order under Section 10, 29 U.S.C.A. § 160, is made against an employer. But Section 9(d) requires that the record touching the certification shall be sent to the court when enforcement or review is sought of an order under Sections 8 and 10 which is based in whole or in part upon the facts certified. This provision, though indicating the certificate is not to be reviewed before an order under Sections 8 and 10 is presented for enforcement or review, clearly means that when an order is presented the record on which the certificate was based may be looked into to determine the lawfulness of the certificate. There can be no other reason for sending up such a record. On reviewing it, we should regard the Board's determination of facts as final, as in reviewing the order based on Sections 8 and 10; and of course in matters which are discretionary, the Board's acts within the limits of law are final. Only where the law has been ignored or violated would the court nullify the certificate of a bargaining representative.

■ If the affirmative act of a majority of all the employees in a unit fixed by the Board is always necessary to designate a bargaining representative for the unit under the above quoted language of Section 9, the certificates in this record would be unlawful, for in each case the certificate rests on the affirmative act of less than a majority. If a representative rests his claim on separate private authorizations, he would have to obtain a majority of all to be "designated or selected" by such a mode. But the statute, Section 9 (c), expressly provides for official action by the Board, and for the "taking by it of a secret ballot" as a means of ascertaining the wish of the unit. There is no express provision as to what sort of majority shall control the result of such an election. The general rule, in the absence of a clear provision otherwise, is that voters who could have voted in a formal election but do not are considered to assent to the will of the majority of those who do vote; so that if those who do vote make up a majority of all, the will of all is expressed by the majority of those who vote. 18 Am.Jur. Elections, § 243; County of Cass v. Johnston, 95 U.S. 360, 24 L.Ed. 416; Carroll County v. Smith, 111 U.S. 556, 4 S.Ct. 539, 28 L.Ed. 517. This rule was applied to different language, but of the same general import, used in the Railway Labor Act, 45 U.S.C.A. § 151 et seq., in Virginia Railway Co. v. Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789. It should be applied here. Where with fair opportunity to all members of the unit to vote, a ma-

jority do vote, they are, so to speak, a quorum to settle the matter, and the majority of that quorum binds those not voting, and suffices to select the bargaining representative of the unit.

The statute does not say how long a certificate of representation shall stand good. It is not intended to be ephemeral, nor should it be perpetual. On general principle, since it ascertains a status as existing, the presumption is that the status continues until shown to have ceased. The employer is, in theory at least, not much concerned, since the employees are to choose their representative unhindered. So long as the employees make no contention that they are not correctly represented, it would seem that the employer could safely continue to deal indefinitely with the designated bargaining agent. In the present case the employees have not protested at all, and the employer has raised the question belatedly. Assuming the question duly raised, the Board decided it adversely. There is no certain evidence that a majority of the present employees do not now desire representation by the Committee. Many persons who were employees a year and a half ago had ceased to be, but it cannot be assumed that all of these were either assenters to or dissenters from the selection of the Committee. On the other hand the newly signed union cards do not prove a gain in assents, for the signers may have voted originally for the Committee. The present wishes of a majority of the employees are not established either way. The presumption of the continuance of the established status justifies the Board's finding that the Committee is still the representative designated and selected by the majority.

2. As to the second point of attack, the Board found that in June and July, 1939, at the very beginning of renewed negotiations broken off nearly a year before, each of the mills announced a cut in wages, without even notifying the Committee, and notwithstanding wages were a part of the contract just proposed by the Committee and taken under advisement by the mills; and this act was adhered to over protest that it should not be done without notice to and recognition of the Committee. The Board held that irrespective of whether or not there was any subsequent bargaining about other matters this was in itself a refusal to bargain. In mitigation or excuse it is shown by the mills that the cut was necessitated by daily operating losses, and it was hoped that the price reduction it made possible would result in more orders and more regular employment; and no mention of it was made to the Committee because the mills understood that wages had been by the Committee's consent eliminated from discussion. But it also appears that the wage cuts were determined on immediately after the Committee notified the mills it desired to negotiate a collective contract, and the misunderstanding about the elimination of wages from the negotiation, if it existed, had been removed in a conference about the cut by one mill before the cut was made by the other mill, which also was protested but without result. The Board finds as a fact: "We cannot credit the excuse asserted by Weekes and Candler for not consulting the T. W. O. C. as regards either the Scottdale reduction or the Whittier and Silver Lake reductions. We find that the respondent's disregard of the T. W. O. C. with respect to these reductions was knowing and deliberate." The quoted finding, while attacked, we think is a factual inference the Board could reasonably make, and is binding on us. The question of law therefore is, Was there in these facts a refusal to bargain within the meaning of Section 8(5)? It cannot be denied that before any contract was made, all these mill hands were employed from day to day, or at best from one payday to the next. Nothing prevented the employer at any time from changing for the future the wages he would pay. Inability to pay the current wage would be the best of reasons for reduction, if any reason were needed. The pendency of a negotiation for a collective contract would not destroy the employer's right in this regard. On the other hand a main purpose of the National Labor Relations Act is to secure amicable bargaining between employers and their employees as a class, through capable designated representatives, and to avoid wrangling, distrust and strife; and the Act requires, when requested, a good faith negotiation touching wages, hours and conditions of labor. Though there be surface bargaining, yet if in reality there is a purpose to defeat it, and wilful obstruction of it, there is a refusal really to bargain. The Board has found that in this case there was not an emergency wage reduction, but there was a deliberate effort by a sudden well-timed

wage cut to discourage if not defeat any bargaining on that subject. Such was the natural effect of it, and if that was its purpose, as the Board finds, adhered to after remonstrance, we hold that there was a refusal to bargain about wages within the Act.

3. The Board goes further and finds that the wage cuts, so timed, and with total disregard of the Committee, were such a flouting of the Committee as necessarily discouraged the employees in maintaining their connection with and representation by it, and interfered with and coerced them contrary to Section 8(1). In the light of the intention attributed by the Board to the mills, we uphold this conclusion, though there is no express proof that any employee was in fact affected or his course changed thereby.

There was also evidence that a foreman, bantering with an employee under him, finally said: "I would not belong to that old union, it causes lots of trouble. You know at the time of the strike over at Porterdale they lost a lot of jobs down there, and it caused them to be moved out." The Board held these words were said seriously and implied a threat to this employee of loss of employment because of union membership. Also a "second hand", who substituted for the overseer when the overseer was off the job, said to another employee: "What makes it so hard on the fellows here today is the way they are treated by this damned union." Isolated speeches like these made by underlings, though having some authority, in casual conversation with fellow employees, which are not authorized or encouraged or even known to the management, ought not to be too quickly imputed to the employer as his breaches of the law. When not made in the exercise of authority, but in personal conversation, they do not appear to be the sentiments of the employer nor his acts, and to make them such the circumstances ought to show some encouragement or ratification or such repetition as to justify the inference of a policy which they express. On the other hand the management might very well issue orders to all having any authority over other employees, that they shall say or do nothing respecting union affiliations. We are not impressed with the strength of these findings of interference, especially since the employees who tell of it seem themselves not to be at all impressed. But the order to desist is sufficiently supported by the finding regarding the wage cuts.

A decree will be entered that the order of the Board be enforced.