NEW HAVEN FEDERATION OF TEACHERS ET AL. *v.*
NEW HAVEN BOARD OF EDUCATION ET AL.

SUPERIOR COURT     NEW HAVEN COUNTY     FILE No. 110044
AT NEW HAVEN

Memorandum filed August 16, 1967

*Satter & Fleischmann*, of Hartford, for the plaintiffs.

*Thomas F. Keyes, Jr.*, corporation counsel, for the named defendant.

*Murtha, Cullina, Richter & Pinney*, of Hartford, for the defendant New Haven Teachers' League.

LONGO, J. In this action for a declaratory judgment the plaintiffs are seeking to have the court declare a collective bargaining agreement or contract between the New Haven board of education and the New Haven Teachers' League invalid in whole or in part. The plaintiffs and defendants have each moved for summary judgment and, in order that no issue of fact shall preclude a determination of the issues of law by summary judgment, have agreed upon a stipulation of facts, thereby eliminating the necessity for a trial to the court. The dispute involves a construction of Public Act No. 298 of the February, 1965, special session (General Statutes §§ 10-153b—10-153f).

The action was instituted by the New Haven Federation of Teachers and by Harold Rogovin, William Delaney and Arnold Epstein, who are certified professional employees of the New Haven board of education, employed or engaged in positions requiring a teaching or special services certificate. Rogovin, Delaney and Epstein are not members of the defendant New Haven Teachers' League.

The complaint is in three counts. The first count alleges that the defendant board of education, hereinafter referred to as the board, and the defendant New Haven Teachers' League, hereinafter referred to as the league, failed to comply with the election provisions of Public Act 298, and therefore asserts that the contract is not binding upon all the certified professional employees of the defendant board. The plaintiff New Haven Federation of Teachers, hereinafter referred to as the federation, claims it is aggrieved because it has been excluded from representing its members in negotiations for the contract. The plaintiffs Rogovin, Delaney and Epstein claim to be aggrieved because they have not been represented in the negotiations for the contract between the board and the league by representatives properly and duly elected in accordance with Public Act 298.

The second count alleges that the board's recognition of the league as the exclusive representative of all certificated professional employees of the board below the rank of superintendent violates Public Act 298. The third count alleges that the grievance procedure contained in the contract violates Public Act 298 in that it provides that a certificated employee of the board, in processing a grievance under the contract, may not be represented by any teacher organization other than the league. The parties have filed extensive briefs, in addition to oral arguments to the court, in support of their respective claims.

In order to summarize the situation for the purposes of this memorandum, the court has set forth from the stipulation of facts those facts which it considers pertinent to the determination of the issues. The New Haven Federation of Teachers is an unincorporated voluntary association, the members of which are certificated professional employees

below the rank of superintendent and are employed by the New Haven board of education in positions requiring a teaching or special services certificate. The New Haven Teachers' League is also an unincorporated voluntary association, whose members are certificated professional employees below the rank of superintendent and are employed by the board in positions requiring a teaching or special services certificate and in positions requiring an administrative or supervisory certificate. On February 12, 1965, the league, by letter from the chairman of its personnel policies committee to the president of the board, requested the board to recognize the league as the exclusive negotiation representative in matters of salary and personnel policy for all of the board's certificated professional employees below the rank of superintendent. The federation opposed this request by the league and requested the board to authorize a representation election to determine which organization should represent board employees. The board, on February 17, 1965, denied the league's request and refused to recognize it as the exclusive representative of the board's professional employees.

On or about March 7, 1965, the federation issued a position paper suggesting the proper procedures for the conduct of a referendum to determine the teachers' bargaining representative and urged that the American Arbitration Association be selected to assist in establishing the election procedure. At the regular meeting of the board on March 8, 1965, the board considered the question whether and in what manner it should determine which organizations should represent its professional employees in negotiations with the board. It adopted a resolution authorizing a representation election and requested the four organizations purporting to represent the board's certificated employees to meet

together and jointly agree upon an appropriate voting unit and procedures for conducting the election. The four staff organizations were the federation, the league, the High School Teachers Association and the New Haven Principals' Club. The board's resolution requested that the agreed recommendations should be submitted no later than April 5, 1965. The four staff organizations were requested to reach a joint agreement on the following questions: (1) In the event of a referendum, what members of the staff will be eligible to vote? (2) What suggestions and ideas can the staff organizations agree to, in regard to procedures to be followed in order to conduct a referendum?

The four staff organizations met on March 18, 1965, but were unable to reach agreement on the two questions. They did agree that each group, no matter how many of its representatives were present, should have one vote on the issues before them, and they also agreed, over the objection of the federation, that a majority vote would control. The organizations chose James J. Dinnan, a nominee of the Principals' Club, as chairman, also over the objection of the federation. On March 25, 1965, another meeting was scheduled, but the federation did not attend. A third meeting was held on March 29, 1965, to which the federation submitted a statement to the other three staff groups, maintaining that the board's resolution of March 8, 1965, required that all decisions be unanimous, because the board requested them to "jointly agree" upon procedures for conducting the election. On April 1, 1965, the league, the High School Teachers Association, and the Principals' Club submitted to the board joint recommendations for the election. The federation would not agree to these recommendations and submitted its own recommendations for the election by letter dated April 2, 1965.

On April 7, 1965, the league forwarded to the board petitions signed by 676 certificated professional employees requesting an immediate election among the employees in the all-inclusive unit to determine an exclusive representative to deal with the board. Thereafter, the board requested the four staff organizations to inform it whether they desired to be on the ballot in an election to determine an exclusive bargaining agent. On April 12, 1965, the Principals' Club informed the board it did not desire to be on the ballot, and on April 13, 1965, the league stated it desired to be on the ballot. The federation, however, on April 13, 1965, stated that it "will withhold its statement of position pending the decision of the Board of Education relating to the teacher bargaining unit election."

At a special meeting held on April 19, 1965, the board was advised that the four staff organizations were unable to agree on the election unit and procedures for a representation election. Thereupon the board voted unanimously to authorize the election on May 3 or 4, 1965, and requested the staff organization to make one last effort to reach an agreement as to appropriate unit and procedures. It also requested the staff organizations to agree upon an impartial mediator, indicating that the board was reluctant to designate a mediator or establish election procedures themselves but they would have no choice if the staff organizations desired an election but could not agree on the unit or procedure. The four staff organizations were unable so to agree, and this continued disagreement was reported to the board prior to its meeting on April 21, 1965.

At a public meeting on April 21, 1965, the board adopted a resolution outlining ground rules for the representation election. The board acknowledged

that the Most Reverend Joseph F. Donnelly, auxiliary bishop of Hartford, had agreed to act as arbitrator to establish election procedures and to conduct and supervise the election. By telegram dated April 22, 1965, the federation notified the board not to place its name on the ballot. Similarly, the Principals' Club reaffirmed its earlier decision not to be on the ballot. The High School Teachers Association, on April 26 and April 27, requested that its name be placed on the ballot.

The procedures were developed by the board and approved by Bishop Donnelly, and the board distributed the final regulations for the election on April 30, 1965. The board resolved the major dispute between the league and the federation as to the appropriate voting unit by providing for a ballot in which the members of the classroom teachers unit and the administrative-supervisory personnel below the rank of superintendent could vote separately in the same election, both as to whether they desired to be represented in separate units or as part of an all-inclusive unit and as to which organization they desired to represent them. The election was held on May 3 and May 4, and the voting was by secret ballot; the ballots were counted on May 5 under the supervision of Bishop Donnelly. The four staff organizations were invited to have observers and challengers at the polls and at the counting of the ballots.

The federation distributed flyers to board employees urging them not to participate in the election and picketed the voting poll. It claimed that it opposed the election because (1) the five days between the date of the announcement setting the date of the election and establishing the procedures were not a reasonable campaign period for the issues to be presented; and (2) the election proce-

dures were established by the board rather than by an impartial and neutral party. On the other hand, the league claimed (1) that the parties knew it was going to be an election and had been campaigning at least since March 8, 1965; and (2) that the federation boycotted the election because it recognized that it did not have sufficient support among the teachers to win.

The results of the election were as follows:

PARTICIPATION

1075 Board employees eligible to vote
 796 Voted

UNIT DETERMINATION

592 Voted for all-inclusive unit
197 Administrative units
  7 Voted not to be represented by any organization

REPRESENTATIVE

627 Voted for the league
125 Voted for the Teachers Association
  6 Voted to have no organization represent them
 34 Wrote in other organizations, including the federation
  4 Blank ballots

Five hundred fifty-eight classroom teachers voted for the league as their representative of the classroom teachers, of the 974 eligible, which constituted 57 percent of the classroom teachers. Of the staff, 24.6 percent failed to vote. Of the classroom teachers who voted, 79 percent voted for the league. The board received and accepted the results of the election at a public meeting on May 10, 1965.

As a result of the election of May 3 and 4, the board, at a public meeting on June 14, 1965, voted unanimously to recognize the league as exclusive negotiating representative of its certificated em-

ployees in the all-inclusive unit for the period from July 1, 1965, through June 30, 1967, unless a petition, signed by not less than 25 percent of the members of the negotiating unit and requesting a new referendum, was presented to the board during the period, in which event the board would provide for a new election.

On June 18, 1965, Public Act 298 was signed by the governor and went into effect.[1] At its next public meeting, on June 28, 1965, the board passed a resolution which modified the June 14 resolution to conform with Public Act 298.[2] By the June 14 resolution as modified by the June 28 resolution, the board recognized the league as exclusive representative of its certificated employees in the all-inclusive unit for the purposes of negotiating with respect to salary schedules and personnel policies, as provided in § 1 (c) of Public Act 298. At the time that the June 14 and 28 resolutions were passed, the members of the board believed that a substantial majority of the board's certificated professional employees desired to be represented in the all-inclusive unit and that they desired the league to represent them in such a unit in negotiations with the board. Nothing had come to the attention of the members of the board—from the time this election was held on May 3 and 4 to the time the board recognized the league, purportedly under Public Act 298, on June 14 and June 28— which indicated that the desires of the board's employees as shown in the May 3 and 4 election had been changed. At no time between May 5,

---

[1] The exhibits generally refer to this as Public Act 298, and for consistency it is so referred to in the stipulation. This act became §§ 10-153b to 10-153f of the General Statutes (see Public Acts 1967, No. 752, for amendments of §§ 10-153b, 10-153c, and 10-153d).

[2] As modified, a new election can be obtained by any teacher organization by submitting a petition signed by 20 percent of the members in either the all-inclusive or the classroom teachers unit.

1965, and June 28, 1965, nor at any time after June 28, 1965, did the federation state to the board that it represented a majority of the board's professional employees either in the classroom teachers unit or in the all-inclusive unit.

On June 21, 1965, the federation appeared before the board, sought to participate in the negotiations with the board, and refused to recognize the board's designation of the league as the sole bargaining agent for the staff, and on or about June 23, 1965, the federation presented to the board its plan for improving the quality of education in inner city schools. The league negotiated with the board as exclusive representative of the board's employees in the all-inclusive unit, purportedly pursuant to Public Act 298, and an agreement was executed between these parties on January 17, 1966; however, on September 30, 1965, Harold Rogovin, president of the federation, protested the secrecy of the negotiations.

Neither the federation nor the league has submitted a petition, requesting a new representation election, signed by 20 percent of the board's certificated professional employees in either the classroom teachers unit or the all-inclusive unit, which would entitle them to such a representation election under Public Act 298.

There are 178 school districts in the state of Connecticut. The league claims that in 152 of these districts there is only one teacher organization purporting to represent school district employees. The federation has no information to affirm or deny this assertion but claims that no teacher organization can be the exclusive representative of the employees without complying with the referendum provisions of Public Act 298. The league claims that seventy-four affiliates of the Connecticut Education

Association are now recognized by school boards as exclusive negotiating representatives for board employees even though they have not participated or won an election pursuant to Public Act 298. The federation claims that although some affiliates of the Connecticut Education Association may be recognized by school boards as negotiating representatives they do not have the right of exclusive representation unless they have complied with the referendum provisions of Public Act 298. The federation further claims that, in each instance where it has an affiliate in a town in the state of Connecticut, the Education Association affiliate is not recognized as the exclusive representative unless it has participated and won an election pursuant to Public Act 298. Moreover, in a number of towns where the board has sought to recognize one teacher organization as the exclusive representative and has been informed by the federation's counsel that it is contrary to Public Act 298, the board has requested a referendum before granting such recognition.

On January 19, 1966, Rogovin, president of the federation, wrote to George Zymajtis, president of the league, protesting the exclusion of nonleague members from a meeting called to accept or reject the proposed contract with the board. It is generally accepted Connecticut practice in all teacher organizations, both affiliates of the league and affiliates of the federation, that only members of an organization may vote on a contract negotiated by it. However, federation affiliates in Connecticut have always permitted all teachers, whether members or not, to attend the meeting at which the vote was taken.

The league, in a special defense, alleges that the plaintiffs have failed to exhaust the remedies made available to them under Public Act 298 and claims

that it was duly selected and recognized by the defendant board and has acted as the unit representative under the contract dated January 17, 1966.

The plaintiffs' motion for summary judgment is embodied in the claims made in the original action of declaratory judgment. Claims of law have been duly filed in accordance with § 223 of the Practice Book. The parties have stipulated, pursuant to § 306 of the Practice Book, that the issues of law presented to the court for adjudication are fully stated in the plaintiffs' complaint and the claims of law filed by the parties.

The first sentence of subsection (a) of § 1 of Public Act 298 (General Statutes § 10-153b [a]) provides as follows: "Any organization or organizations of certificated professional employees of a local or regional board of education may be selected for the purpose of representation in negotiations concerning salaries and all other conditions of employment." This provision recognizes the well-established right of employees to be represented by organizations such as the federation, the league, the High School Teachers Association or the New Haven Principals' Club in negotiations with a local or regional board of education concerning salaries and all other conditions of employment. Subsection (a) also provides that representatives "may be designated or selected" for the purpose of negotiating by the majority of the employees in the entire group of employees below the rank of superintendent or by the majority of the employees in separate units. This portion of subsection (a) classifies the employees eligible to select or designate the representative for negotiation purposes.

Subsection (b) provides as follows: "All certificated professional personnel below the rank of superintendent, other than temporary substitutes,

employed and engaged either (i) in positions requiring a teaching or special services certificate or (ii) in positions requiring an administrative or supervisory certificate, may select a separate representative by a secret ballot decision of a majority of the personnel voting in each of the two said categories. If twenty per cent or more of the certificated professional employees . . . below the rank of superintendent in either the entire group or in the separate units . . . file with the secretary of the state board of education a petition requesting that a teacher representation referendum be held to select an organization for the purpose of representation, said secretary shall file notice of such petition with the local or regional board of education." Thus, while subsection (b) permits the selection of a separate representative by a secret ballot decision of the majority of the personnel voting, only if twenty percent or more file a petition with the secretary of the state board of education requesting that a teacher representation referendum be held to select an organization for the purpose of representation is a referendum required. In the instant situation, it is admitted that no petition was filed subsequent to the enactment of Public Act 298.

It is apparent to the court that the main thrust of the plaintiffs' claims is directed to the prior designation of the league as the exclusive negotiating representative without compliance by the board of education with the provisions of Public Act 298. The plaintiffs claim that compliance with the act was mandatory after its effective date, namely, June 18, 1965, and it nullified the recognition of the league as exclusive representative as a result of the election held on May 3 and 4, 1965.

In the first instance, Public Act 298, § 1 (General Statutes § 10-153b) was enacted and designed to

establish procedures for the selection or designation of an organization to exclusively represent teachers and to negotiate on their behalf. The act is permissive in nature, although some of its provisions are mandatory if the act is employed. Although the plaintiffs suggest in their briefs that the act, as a remedial statute, governing procedure, can be retroactively applied, the court is of the opinion that it should be construed as operating prospectively, no contrary intent clearly appearing. *McAdams* v. *Barbieri,* 143 Conn. 405, 414; *Lavieri* v. *Ulysses,* 149 Conn. 396. Assuming such to be the applicable law, the legality of the designation of the league as exclusive representative can be invalidated if the plaintiffs successfully attack the reasonableness and validity of the procedures adopted by the board in arriving at its designation in the absence of statutory direction.

In the opinion of the court, the designation of the league was validly made and was not affected by the subsequent enactment of Public Act 298. An examination of the stipulation of facts reveals a conscientious effort on the part of the board impartially to determine the right of rival organizations to represent the board's employees for the purpose of negotiating with the board. Having been requested by the league to recognize that organization as exclusive negotiation representative, a step which was opposed by the federation, which was in favor of a representation election, the board endeavored to allow the four organizations to formulate their own procedures for the conduct of the referendum and requested them to agree jointly on the voting unit and procedures. The four organizations were unable to jointly agree. Having been so informed, and having been presented by the league with a petition, signed by 676 certificated professional employees representing a majority, request-

ing an immediate election, the board proceeded to carry out what in effect was a mandate, proper under fair labor negotiating standards, to hold an election. The procedures were formulated by the board, and Bishop Donnelly was requested to conduct the election as a mediator. The federation refused to allow its organization to be placed on the ballot and in fact picketed the election and requested its members to boycott the election. As a result of the election the league was successful, as indicated by the results above stipulated. The board provided for a new election if a petition signed by not less than 25 percent of the members of the negotiating unit requested a new referendum during the period of July 1, 1965, through June 30, 1967. The federation, however, failed to avail itself of the referendum petition procedure as provided by the board, or, if applicable, the referendum procedure provided by subsection (b) of § 1 of Public Act 298 (General Statutes § 10-153b [b]). There is no merit to the claim that the plaintiffs had insufficient notice to prepare for the election. The court finds that the ballot was proper in form.

It has been stipulated that nothing had come to the attention of the members of the board, from the time this election was held on May 3 and 4 to the time the board recognized the league, purportedly under Public Act 298, on June 14 and June 28, which indicated that the desires of the board's employees as shown in the May 3 and 4 election had been changed. Until such indication became known to the board, the selection or choice of representation by virtue of the election held on May 3 and 4 was one which continued and permitted the designation by the board of the league as the official representative of the teachers. Under the rule of the national labor relations board, majority status is presumed to continue "until shown to have

ceased." *National Labor Relations Board* v. *Whittier Mills Co.*, 111 F.2d 474, 478.

The court disagrees with the plaintiffs' claim that the sole means by which exclusive representatives may be chosen is by elections held pursuant to the provisions of Public Act 298. The act does not require, by its language, such interpretation. The words "designated" and "selected" are, as claimed by the plaintiffs, interchangeably used in the act, but definitions of neither term contain the word "elect" or "election." The term "designate" means to "mark out and make known; to point out; to name; indicate." Webster, New International Dictionary (2d Ed.). The word "select" means to "make a selection; choose"; "[t]o take by preference from among others; to pick out; to cull." Id. Subsection (a), by use of the words "selected" and "designated," means merely a choosing, not, as claimed by the plaintiffs, limited to an election. The national labor relations board, which is similar in many respects to Public Act 298, has recognized, and the courts have approved, other methods of designation than by an election. *United Mine Workers* v. *Arkansas Oak Flooring Co.*, 351 U.S. 62, 72 n.8; *Lebanon Steel Foundry* v. *National Labor Relations Board*, 130 F.2d 404, 407.

The federation further claims that the grievance provisions of the contract violate the rights guaranteed by Public Act 298 to process the grievances of its members. Subsection (c) of § 1 (General Statutes § 10-153b [c]) provides as follows: "The representatives designated or selected as provided in subsection (a) of this section shall be the exclusive representatives of all the employees in such unit for the purposes of negotiating with respect to salary schedules and personnel policies relative to employment of certificated professional employees,

provided any certificated professional employee or group of employees shall have the right at any time to present any grievance to such persons as the local or regional board of education shall designate for that purpose." Article 21, § 3b, of the agreement provides as follows: "Any party in interest may be represented at all stages of this grievance procedure by a person of his own choosing, except that he may not be represented by a representative or by an officer of any teacher organization other than the League. When a teacher is not represented by the League, the League shall have the right to be present and to state its views at all stages of this grievance procedure."

The plaintiffs contend that although the contract permits any party in interest to be represented at all stages of the grievance procedure by a person of his own choosing, it violates subsection (c) in prohibiting representation by a representative or by an officer of any teacher organization other than the league. The plaintiffs argue that the statute grants to the federation the right not only to present grievances but also to represent employees by advice and other means of assistance at the hearing. Assuming, arguendo, that the legislature intended the words "present any grievance" to mean "present grievances and represent employees," such right was explicitly given to "any . . . employee" or "group of employees." If the legislature had intended to give such right or privilege to any organization or representative of an organization, such as the federation, it should have used language appropriate to carry out its intention. In any event, the court is of the opinion that the provision in the contract prohibiting representation of persons aggrieved by a minority organization and its officers or agents is not contrary to the provisions of Public Act 298 and is in keeping with repeated decisions

of the national labor relations board holding similar provisions in labor contracts valid and not an unfair labor practice. *Mooresville Cotton Mills* v. *National Labor Relations Board,* 94 F.2d 61; *New York Times Co.,* 26 N.L.R.B. 1094; *Hughes Tool Co.* v. *National Labor Relations Board,* 147 F.2d 69.

The plaintiffs claim that unless there has been a referendum under Public Act 298 no organization has the right to represent the teachers to the exclusion of any other organization, but rather all teacher organizations are entitled to equal rights to negotiate with the board of education. Section 3 of Public Act 298 (General Statutes § 10-153d) does not so provide but does state that only in the absence of any certification as the exclusive representative as provided by § 1 (§ 10-153b) shall all organizations seeking to represent members of the teaching profession be accorded equal treatment with respect to access to teachers, principals, members of the board of education, records, and participation in discussions with respect to salaries and other conditions of employment. Here, there had been a certification of the league as exclusive representative, which precludes the right of any other organization to have the equal treatment accorded by Public Act 298 in the event of noncertification.

In accordance with the agreement with counsel that this matter may be adjudicated by entry of summary judgment, it is ordered, therefore, that the defendants' motion for summary judgment be granted, and the plaintiffs' motion for summary judgment is denied.