KAREN LeCRAFT HENDERSON, Circuit Judge,
dissenting:
Seventeen years ago, this Court had to rein in the National Mediation Board (NMB or Board) for “blatantly [] exceeding] its statutory authority” and, in doing so, it minced no words. See Ry. Labor Execs.’ Ass’n v. Nat’l Mediation Bd., 29 F.3d 655, 664 (D.C.Cir.1994). Writing for the en banc Court, Judge Edwards vacated a Board procedure authorizing both carriers and the Board sua sponte to trigger Board investigations of representation disputes under section 2, Ninth of the Railway Labor Act (Act), 45 U.S.C. § 152, Ninth. Id. For the previous sixty years, the Board had initiated such investigations only on petition of, or on behalf of, employees, as section 2, Ninth commands. The Court assailed the Board’s “gross violation” of section 2, Ninth, concluding that the procedure was “not only unprecedented, but legally insupportable as well.” Id. at 659, 664.[1] It looks to me as though the Board is at it again, only this time my colleagues are letting them get away with it. Accordingly, I respectfully dissent.
Section 2, Fourth provides: “The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class....” 45 U.S.C. § 152, Fourth. Were I writing on a clean slate — that is, without knowing the background of section 2, Fourth’s enactment, without reading the Supreme Court’s decision in Virginian Railway v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937), and, most important, without using the Chevron[2] invention — I would conclude, as urged by Appellant American Transport Association of America, Inc. (ATA), that section 2, Fourth means the majority of the relevant craft/class must vote for, or otherwise endorse, unionization. While the overlay created by the provision’s background, by the Supreme Court’s reading of it and even by the Chevron sequence has complicated otherwise straightforward language, what it has not done is to replace “majority”[3] participation with a lesser number.
The 1934 amendment of the Railway Labor Act, of which section 2, Fourth is a part, is discussed in Virginian Railway. The case involved a representation dispute pitting the “company union,”[4] the Mechan *490 ical Department Association of the Virginian Railway (Association), against System Federation No. 40, a local of the American Federation of Labor (Federation). The Board subsequently certified the Federation as the “duly accredited representative of petitioner’s employees in the six shop crafts,” including all mechanical department employees except for the carmen and coach cleaners.[5] Virginian Ry., 300 U.S. at 539, 57 S.Ct. 592. Notwithstanding the Board’s certification, the railroad refused to recognize the Federation, even organizing another company union. Id. at 539-40 & n. 1, 57 S.Ct. 592. The railroad made several challenges, including one to the certification of the Federation as the blacksmiths’ representative. The blacksmiths’ craft had 46 members eligible to vote and 30 — a majority of the craft — had participated in the election. Because the Federation had not received a majority of the votes of the entire craft (23 plus 1 or more) but instead only 22 votes (the other 8 voting for the company union), the railroad maintained the Board’s certification of the Federation was invalid. See Sys. Fed’n No. 40 v. Virginian Ry. Co., 11 F.Supp. 621, 626 n. 1 (E.D.Va.1935).
The Supreme Court upheld the certification of the Federation, however, and, in so doing, interpreted section 2, Fourth' — an interpretation that has endured ever since. Rejecting the railroad’s reading, the Court noted that section 2, Fourth “confer[s] the right of determination upon a majority of those eligible to vote, but is silent as to the manner in which that right shall be exercised.” Virginian Ry., 300 U.S. at 560, 57 S.Ct. 592. Borrowing from the “general[ ] construction]” of election laws that require for success a majority vote of the electorate, the Court stated the majority vote of the electorate means “the consent of the specified majority of those participating,” while those not participating “ ‘are presumed to assent to the expressed will of the majority of those voting.’ ” Id. (quoting Cnty. of Cass v. Johnston, 95 U.S. 360, 369, 24 L.Ed. 416 (1877)). The Court’s next words bear quoting:
We see no reason for supposing that section 2, Fourth (45 USCA § 152, subd. 4), was intended to adopt a different rule. If, in addition to participation by a majority of a craft, a vote of the majority of those eligible is necessary for a choice, an indifferent minority could prevent the resolution of a contest, and thwart the purpose of the act, which is dependent for its operation upon the selection of representatives.
Id.[6] The Court concluded its discussion by examining the congressional intent manifested in the language used in section 2, Fourth, noting that it was taken from a rule promulgated by the former Railroad Labor Board pursuant to the Transportation Act of 1920, a predecessor of the Act. The Labor Board had construed the language to mean that a majority of the votes cast sufficed to select a representative “where it appeared that a majority of the *491 craft participated in the election.” Id. at 561, 57 S.Ct. 592 (emphasis added).
While Virginian Railway addresses many other issues,[7] its resolution of the section 2, Fourth issue makes one critical point unmistakably clear: the majority of the craft/class must participate in any unionization election. That majority participation is a condition precedent is manifested by the fact that the carmen and coach cleaners election in which the majority of the craft did not participate was declared invalid and, although the declaration was not appealed, the Court saw fit to note the declaration in its six-paragraph discussion of section 2, Fourth. Moreover, in adopting its majority-of-votes-cast-mifemajority participation interpretation, the Court expressly described majority participation as “necessary” when it declined to make, “in addition,” the majority of those eligible to vote necessary to choose a representative. And its use of the phrase “indifferent minority” makes clear that “majority participation” is required; otherwise the “indifferent” (i.e., non-participating) members of the craft/class could have just as easily comprised a majority.
As noted, Virginian Railway’s construction of section 2, Fourth has endured for over three-quarters of a century. In 1943, our Circuit applied Virginian Railway, construing section 2, Fourth to require for unionization “the majority of the votes cast at an election, provided a majority of those eligible to vote have participated.” See Bhd. of Ry. & S.S. Clerks v. United Transp. Serv. Emps. of Am., 137 F.2d 817, 819 (D.C.Cir.1943) (citing Virginian Ry.) rev’d per curiam on jurisdictional ground, 320 U.S. 715, 64 S.Ct. 260, 88 L.Ed. 420 (1943) (emphasis added); see also Nashville, C. & St. L. Ry. v. Ry. Emps. ’ Dept. Labor, 93 F.2d 340, 343 (6th Cir.1937) (upholding Board’s certification based on majority of votes cast because majority of eligible employees voted) (citing Virginian Ry.); NLRB v. Whittier Mills Co., 111 F.2d 474, 477-78 (5th Cir.1940) (interpreting Virginian Railway’s holding as “[wjhere with fair opportunity to all members of the unit to vote, a majority do vote, they are, so to speak, a quorum to settle the matter, and the majority of that quorum binds those not voting, and suffices to select the bargaining representative of the unit”); see also Ass’n of Clerical Emps. v. Bhd. of Ry. & S.S. Clerks, 85 F.2d 152, 156 (7th Cir.1936) (pursuant to section 2, Fourth, if majority of eligible employees participates in election, “the general rule applies that those not voting at an election should be considered as assenting to the will of the majority there expressed”) (citing Cnty. of Cass v. Johnston, 95 U.S. 360, 24 L.Ed. 416 (1877)). But see NLRB v. Cent. Dispensary & Emergency Hosp., 145 F.2d 852, 853-54 (D.C.Cir.1944) (in election under National Labor Relations Act, Virginian Railway construed to apply majority-of-votes-cast rule); Int’l Bhd. of Teamsters v. Bhd. of Ry., Airline & S.S. Clerks (BRAC), 402 F.2d 196, 204 n. 16 (D.C.Cir.1968) (same).
Having considered the backdrop against which section 2, Fourth was enacted as well as the lone Supreme Court decision construing it, I am convinced, as I would have been had I not considered the background and Virginian Railway overlay, that section 2, Fourth unambiguously requires that the majority of the craft/class must participate in any representation election. Section 2, Fourth grants the majority of a craft/class the collective right to determine the representative; it does not grant each employee an individual right to vote in an election as is the case with *492 popular elections.[8] While we all agree that every eligible employee is entitled to vote, the issue is who determines the representative: the majority of those who vote for a representative with majority participation or the majority of those who vote for a representative without majority participation? Section 2, Fourth declares loud and clear that the majority — which collectively possesses the right — necessarily must participate in determining the representative.
The Supreme Court reached the same conclusion in Virginian Railway, finding section 2, Fourth “silent” (and therefore unclear) only “as to the manner” in which the majority’s right is to be exercised. While the Court included within “manner” whether the majority of the craft/class must also vote for a particular union— deciding it did not — it did not find section 2, Fourth “silent” as to majority participation. This being so, I believe section 2, Fourth in pertinent part merits a Chevron one analysis, that is, its requirement that the majority of the craft/class participate in determining unionization vel non is unmistakably plain.
And so I come to the NMB’s challenged rule, which provides in relevant part:
In representation disputes, a majority of valid ballots cast will determine the craft or class representative.
75 Fed. Reg. at 26,062 (emphasis added).[9] Because the rule jettisons majority participation, it violates section 2, Fourth and, accordingly, I would invalidate it. U.S. Dep’t of State v. Coombs, 482 F.3d 577, 580 (D.C.Cir.2007) (striking down agency regulation “as an impermissible interpretation” of statutory language). As Chevron itself emphasizes: “The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.” 467 U.S. at 843 n. 9, 104 S.Ct. 2778. In interpreting the plain meaning of section 2, Ninth in Railway Labor Executives’ Ass’n, supra, we left no doubt as to the limited, if any, applicability of deference to an agency’s statutory interpretation if “Congress has directly spoken to the precise question at issue” and left “no gap for the agency to fill.” Ry. Labor Execs.’ Ass’n, 29 F.3d at 671 (internal citation omitted); see also Natural Res. Def. Council v. Reilly, 983 F.2d 259, 266 (D.C.Cir.1993) (“[I]t is only legislative intent to delegate such authority that entitles an agency to advance its own statutory construction for review under the deferential second prong of Chevron.”) (internal quotation omitted). Here, the Congress has spoken to the precise question at issue — who determines the representative of a craft/class' — and has left no gap to be *493 filled by a Board rule that impermissibly reads “majority” out of section 2, Fourth.
Assuming without concluding that the Board’s challenged rule is a permissible interpretation of section 2, Fourth, it nonetheless fails at Chevron step two because the Board has failed to provide a “reasoned explanation” therefor. See Village of Barrington v. Surface Transp. Bd., 686 F.3d 650, 660 (D.C.Cir.2011). While under Chevron step two the Board is free to reinterpret section 2, Fourth in favor of an alternative, permissible interpretation, it must nonetheless explain itself. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 129 S.Ct. 1800, 1810-11, 173 L.Ed.2d 738 (2009) (agency must provide “reasoned explanation” for adopting new, permissible interpretation of statute).
The Board relies primarily on judicial interpretations of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151 et seq., to support the challenged rule, Appellee’s Br. at 26-29, but the fit is far from neat given the Supreme Court’s admonition that “the NLRA cannot be imported wholesale into the railway labor arena. Even rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes.” Trans World Airlines, Inc. v. Indep. Fed’n of Flight Attendants, 489 U.S. 426, 439, 109 S.Ct. 1225, 103 L.Ed.2d 456 (1989) (internal quotation marks omitted). Caution is particularly needed here where the statutory schemes provide different mechanisms for ascertaining whether a representative has the support of the majority of the craft/class it seeks to represent. While section 9(a) of the NLRA uses language similar to section 2, Fourth to apply the majority-of-votes-cast rule in selecting a representative, the NLRA also provides for judicial review of elections conducted thereunder. 29 U.S.C. § 159(a);[10] see Cent. Dispensary & Emergency Hosp., 145 F.2d at 854 (“While the standards by which the [NLRB] determines whether a minority election is truly representative are necessarily vague, they may still be subject to judicial examination and review in case the judgment of the [NLRB] is arbitrary.”). The certification vel non resulting from a representation election under the Act, however, is subject to judicial review only in extraordinary circumstances. Switchmen’s Union of N. Am. v. Nat’l Mediation Bd., 320 U.S. 297, 305-06, 64 S.Ct. 95, 88 L.Ed. 61 (1943); Int’l Ass’n of Machinists v. Trans World Airlines, Inc., 839 F.2d 809, 811 (D.C.Cir.1988) (“[j]udicial review of NMB decisions is one of the narrowest known to the law” and “courts have no authority to review NMB certification decisions in the absence of ... a gross violation of the Railway Labor Act”). Thus, the safeguard provided by judicial review available under the NLRA is not available under the Act. One reason for the unavailability of judicial review is that “[t]he Act puts a premium on speed of resolution” and section 2, Fourth is intended to ensure that representation disputes are not “dragg[ed] out ... into other tribunals of law.” BRAC, 402 F.2d at 204-05 (internal quotation marks omitted). By certifying an unstable (i.e., minority-supported) representative, the new rule heightens the risk of a disruption to interstate commerce, thus undermining a key purpose of the Act. 45 U.S.C. § 151a (one purpose of Act is “[t]o avoid any interruption to commerce or to the operator of any carrier engaged therein”); see infra note 13.
*494 How the Board “reasonably decided,” Majority Op. at 482, that continuing to require the majority of a craft/class of employees to participate would allow “an indifferent minority to prevent the resolution of a contest” escapes me. Virginian Ry., 300 U.S. at 560, 57 S.Ct. 592. As already noted, the “indifferent minority” concern in Virginian Railway was that the 16 blacksmiths who did not vote could prevent the resolution of the representation contest in which the majority of blacksmiths had voted but had split their votes between two representatives, resulting in neither having received the votes of the majority of the craft/class. Virginian Ry., 300 U.S. at 559-60, 57 S.Ct. 592. Accordingly, the Court ensured that the minority, indifferent or coerced, id. at 560, 57 S.Ct. 592, could not control the outcome by giving effect to section 2, Fourth’s mandate that the majority of blacksmiths participate in the election. Id. In contrast, under the new rule, the minority can — and will— control the outcome because the majority “of valid ballots cast” determines representation without regard to the majority participation condition.[11]
Moreover, the Board fails to explain why labor stability is no longer a relevant consideration for its new rule but remains relevant for its “showing of interest” requirement. The Board initiates a representation election for an unrepresented craft/class if it obtains authorization from 35% of the employees but it requires authorization from a majority of the employees to initiate a “decertification” election process for a represented craft/class. See 29 C.F.R. § 1206.2.[12] The Board bases unequal “showing of interest” requirements for represented and unrepresented crafts/ classes on the promotion of labor stability, namely, the need to prevent a rival union from raiding a represented craft/class. 75 Fed. Reg. at 26,078-79. But the challenged rule, coupled with the 35% authorization requirement for an unrepresented craft/class, practically ensures labor instability by securing support from only a minority of eligible employees.[13] More *495 over, the elevated showing of interest requirement plus the Board’s convoluted decertification process (which the majority opinion itself requires three pages to explain, see Majority Op. at 484-86) belie my colleagues’ prediction that the majority of a craft/class “can simply call for a new election” if the Board certifies a representative based on minority determination. Id. at 481 (emphasis added).[14]
Finally, it is important to remember the Board’s intended role in labor disputes and, once again, our en banc decision in Railway Labor ■ Executive’s Ass’n is instructive. Discussing the legislative history of the Act, the Court stated that, “[b]e-cause mediation was considered to be the Board’s primary function, Congress sought to delineate the Board’s other roles in a manner that would avoid compromising its effectiveness as a mediator.” 29 F.3d at 668 (emphasis added); see also Ry. Labor Execs.’ Ass’n, 988 F.2d at 140 (citing Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 580-81 & n. 13, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971)) (“suggesting that Congress carefully composed RLA’s provisions to preserve employees’ confidence in the Board as a detached, impartial mediator”). The Board’s challenged rule not only conflicts with section 2, Fourth but it also elevates the Board’s rule-making function at the expense of its primary function as unbiased mediator. By imposing minority rule in representation elections, the Board has put itself squarely on the side of representation and thereby abandoned its legitimate role.[15]
For the foregoing reasons, I respectfully dissent.

.The vacated panel opinion, written by then-Judge Ruth Bader Ginsburg, had likewise invalidated the Board's procedure, concluding that it was "without legislative license,” Ry. Labor Execs.' Ass’n v. Nat’l Mediation Bd., 988 F.2d 133, 134 (D.C.Cir.1993), vacated, 996 F.2d 1271 (D.C.Cir.1993) (en banc), and reminding the Board that it "may not serve as surrogate legislator.” Id. at 141 n. 10. The Board plainly needed that reminder, as the panel opinion emphasized by relying on, inter alia, Detroit & T.S.L. R.R. v. United Transp. Union, 396 U.S. 142, 158-59, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). See id. In that case, 25 years earlier, the U.S. Supreme Court had declared: "Certainly there is nothing in the [Railway Labor] Act which can be interpreted as giving the Mediation Board the power to change the plain, literal meaning of the statute.” Detroit & T.S.L. R.R., 396 U.S. at 159, 90 S.Ct. 294.

. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

. “Majority” means "a number greater than half of a total.” Webster's Third New Int’l Dictionary 1363 (1993).

. A "company union” was organized and controlled by the railroad to, inter alia, counter efforts by employees to organize rival unions. Representation Election Procedure, 75 Fed. Reg. 26,062, 26,074 (May 11, 2010).

. The carmen and coach cleaners were not included in the Board's certification because, as the district court held, a majority of that craft had not participated in the election. Sys. Fed’n No. 40 v. Virginian Ry. Co., 11 F.Supp. 621, 628 (E.D.Va.1935). No party appealed from the district court’s holding. Virginian Ry., 300 U.S. at 559, 57 S.Ct. 592.

. At the time, employees were not allowed to vote for "no representation.” Instead, they could select only between competing unions. The Board instructed employees who wanted no representation to abstain from voting because, at that time (and until it promulgated the challenged rule) it considered non-voting employees as having voted for "no representation.” 75 Fed. Reg. at 26,062-63; see e.g., Sys. Fed’n No. 40, 11 F.Supp. at 626 n. 1 (ballot allowed employees to vote for Federation or Association only). See infra note 9.

. Indeed, the Court described the railroad’s section 2, Fourth challenge as a "minor objection[].” Virginian Ry., 300 U.S. at 541, 57 S.Ct. 592.

. My colleagues’ discussion of presidential elections, Majority Op. at 493-94, thus misses the crucial issue.

. The challenged rule effects a change in the Board's treatment of non-voters. Under the old rule, the Board presumed that non-voters opposed representation. 75 Fed. Reg. at 26,-062-63. Under the new rule, the Board presumes that non-voters "acquiesce in the will of the voting majority.” Id. at 26,078. The Board's volte face in this case is reminiscent of its ill-fated Merger Procedures which we struck down as a violation of section 2, Ninth in Railway Labor Executives’ Ass’n, supra. There, we characterized its action as "much more than a midstream change in course; [it is] a wholesale attempt to rewrite the statute and history.” 29 F.3d at 669. Just as section 2, Ninth left the Board without authority to adopt the Merger Procedures, id. at 664-71, section 2, Fourth does not authorize the Board to presume the acquiescence of nonvoters if the majority of a craft/class has not participated in a representation election. The Board does not "possess[] plenary authority to act within a given area simply because Congress has endowed it with some authority to act in that area.” Id. at 670 (emphases in original).

. Section 9(a) provides in relevant part: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit.... ”29 U.S.C. § 159(a).

. As the ATA notes, under the Act, representatives are generally certified on a nationwide or company-wide basis. Appellants’ Br. at 35. By contrast, representatives under the NLRA are generally certified on a local basis. Because a certified representative under the Act represents all of an air carrier’s pilots in the United States, the new rule would allow 100 pilots voting in Kansas City to force thousands of pilots nation-wide to accept representation. Id. at 35; cf. 29 U.S.C. § 159(b) (certification under NLRA generally by local bargaining unit).

. The regulation provides that
(a) Where the employees involved in a representation dispute are represented by an individual or labor organization ... a showing of proved authorizations (checked and verified as to date, signature, and employment status) from at least a majority of the craft or class must be made before the National Mediation Board will authorize an election or otherwise determine the representation desires of the employees under the provisions of section 2, Ninth, of the Railway Labor Act.
(b) Where the employees involved in a representation dispute are unrepresented, a showing of proved authorizations from at least thirty-five (35) percent of the employees in the craft or class must be made before the National Mediation Board will authorize an election or otherwise determine the representation desires of the employees under the provisions of section 2, Ninth, of the Railway Labor Act.
29 C.F.R. § 1206.2.

.The Board has recognized that
One need look no further than to the area of potential strikes to conclude that certification based upon majority participation promotes harmonious labor relations. A union without majority support cannot be as effective in negotiations as a union selected by a process which assures that a majority of employees desire representation. *495 Chamber of Commerce, 14 N.M.B. 347, 362 (1987) (emphasis added); see also BRAC, 402 F.2d at 203-04.

. My colleagues also insist on labeling the ATA’s interpretation of section 2, Fourth’s majority requirement as a "quorum requirement.” Majority Op. at 480, 480-81, 481-83, 484-85. Although I believe their lengthy quorum requirement discussion is a distraction, I remind them of the Supreme Court's recent holding in New Process Steel, L.P. v. NLRB, - U.S. -, 130 S.Ct. 2635, 177 L.Ed.2d 162 (2010). In determining that the NLRB must maintain a membership of at least three to delegate its authority, the Court emphasized that "[a] quorum is the number of members of a larger body that must participate for the valid transaction of business.” New Process Steel, 130 S.Ct. at 2642 (emphasis added). The "quorum” that "must participate” under section 2, Fourth is the majority of a craft/class of employees. Cf. id. at 2644 (“The requirement of a quorum is a protection against totally unrepresentative action in the name of the body by an unduly small number of persons[.]” (quoting Robert’s Rules of Order § 3, p. 20 (10th ed. 2001))).

. Because I believe the new rule fails under both steps of Chevron, I see no need to address the ATA’s protests regarding the deficiencies in the Board's rule-making process. See Majority Op. at 483-89. My silence, however, does not indicate acquiescence in that portion of the majority opinion.